UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BOARD OF COMMISSIONERS OF THE** | * | **CIVIL ACTION** |
| **SOUTHEAST LOUISIANA FLOOD** | * | |
| **PROTECTION AUTHORITY – EAST,** | * | **NO. 13-5410** |
| **INDIVIDUALLY AND AS THE BOARD** | * | |
| **GOVERNING THE ORLEANS LEVEE** | * | **JUDGE:** |
| **DISTRICT, THE LAKE BORGNE BASIN** | * | |
| **LEVEE DISTRICT, AND THE EAST** | * | **MAGISTRATE:** |
| **JEFFERSON LEVEE DISTRICT** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **TENNESSEE GAS PIPELINE COMPANY,** | * | |
| **LLC, et al.** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## NOTICE OF REMOVAL

**TO: THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

United States Courthouse
New Orleans, Louisiana

**NOW INTO COURT**, through undersigned counsel, comes Defendant, Chevron U.S.A. Inc. ("Chevron"), and with a full reservation of rights, hereby removes to this Court the civil action in the Civil District Court for the Parish of Orleans, State of Louisiana, entitled *Board of Commissioners of the Southern Authority — East, Individually and as the Board Governing the Orleans Levee District, The Lake Borgne Basin Levee District, and the East Jefferson Levee District v. Tennessee Gas Pipeline Company, LLC; Alta Mesa Services, LP; Anadarko E&P Onshore, LLC; Apache Corp.; Atlantic Richfield Co.;, BEPCO LP; BHP Billiton Petroleum (KCS Resources), LLC; Boardwalk Pipeline Partners, LP; BOPCO, LP; BP American Production Company; BP Oil Pipeline Co.; BP-Pipelines (North America), Inc.; Callon Offshore Production, Inc.; Callon Petroleum Company; Caskids Operating Company; Castex Energy,*

1

Inc.; Cemex, Inc.; Centerpoint Energy Resources Corp.; Chevron Pipe Line Company; Chevron U.S.A., Inc.; Chroma Operating, Inc.; Clayton Williams Energy, Inc.; Clovelly Oil Co. LLC; Coastal Exploration and Production, LLC; Collins Pipeline Company; ConocoPhillips Company; Continental Oil Company; Cox Operating, LLC; Crawford Hughes Operating Company; Crosstex LIG, LLC; Delta Exploration, Inc.; Davis Oil Company; Devon Energy Production Company, L.P.; Energen Resources Corporation; Enterprise Intrastate LLC; EOG Resources, Inc.; EP Energy Management, LLC; Estate of William G. Helis; Exxon Mobil Corporation; ExxonMobil Pipeline Company; Flash Gas & Oil Northeast, Inc.; Graham Royalty, Ltd.; Greka AM, Inc.; Gulf Production Company, Inc.; Gulf South Pipeline Company LP; Harvest Oil & Gas, LLC; Helis Oil & Gas Company, LLC; Hess Corporation, A Delaware Corporation; Hilliard Oil & Gas, Inc.; HKN, INC.; Integrated Exploration & Production LLC; J.C. Trahan Drilling Contractor, Inc.; J.M. Huber Corporation; Kenmore Oil Co., Inc.; Kewanee Industries, Inc.; Kilroy Co. of Texas, Inc.; Koch Exploration Company, LLC; Koch Industries, Inc.; Liberty Oil & Gas Corporation; LLOG Exploration Company; Manti Operating Company; Marathon Oil Company; McMoran Exploration Company; MOEM Pipeline, LLC; Mosbacher Energy Company; Murphy Exploration & Production Company; Natural Resources Corporation of Texas; Newfield Exploration Gulf Coast, LLC; Noble Energy, Inc.; O'Meara, LLC; ORX Resources, LLC; P.R. Rutherford; Placid Oil Company; Plains Pipeline, LP; PXP Producing Company, LLC; Republic Mineral Corporation; RIPCO, LLC; Rozel Operating Company; S. Parish Oil Company, Inc.; Seneca Resources Corporation; Shell Oil Company; Source Petroleum, Inc.; Southern Bay Energy, LLC; Southern Natural Gas Company, LLC; Statoil Exploration (US), Inc.; Sun Oil Company; Sundown Energy LP; The Louisiana Land and Exploration Company LLC (Maryland); The Meridian Resource & Exploration, LLC; The

2

Pickens Company, Inc.; Union Oil Company of California; Vintage Petroleum LLC; White Oak Operating Company, LLC; Whiting Oil & Gas Corporation; Williams Exploration Company; and Yuma Exploration and Production Co., Inc., Civil Action No. 13-6911, Division "J" ("the Petition"), which is attached hereto as Exhibit A.

**INTRODUCTION AND**
**OVERVIEW OF GROUNDS FOR REMOVAL**

1.      This Court is a proper venue because the Board of Commissioners of the Southeast Louisiana Flood Protection Authority — East (the "Plaintiff") filed the Petition on July 24, 2013, in the Civil District Court for the Parish of Orleans, State of Louisiana, Case No. 13-6911, Division J.

2.      Pursuant to 28 U.S.C. § 1446(a), Chevron attaches as Exhibits A and B to this Notice of Removal a copy of all process, pleadings, and orders served upon it in this action. The only two items in the state court public record are (1) the Petition, and (2) a letter dated July 30, 2013, from Emma E. Antin Daschbach to Hon. Dale Atkins, Clerk of Court. Certain items, including the Petition's Exhibit E, a motion to file the exhibit under seal, and an order granting the motion, are filed under seal and are therefore not attached.

3.      Chevron has not yet been served with a copy the Petition. Accordingly, this Notice of Removal is being filed within thirty days after the receipt by Chevron, through service or otherwise, of a copy of the Petition.

4.      Pursuant to 28 U.S.C. § 1453(b), the consent of the other Defendants is not required. Moreover, Chevron is not aware of any Defendant that has been served or has made an appearance as of the time of the filing of this Notice of Removal. No consents to this Notice of Removal are required pursuant to 28 U.S.C. § 1446(b)(2)(A).

5.      Pursuant to 28 U.S.C. § 1446(d), undersigned counsel certifies that, promptly after the filing of this Notice of Removal, copies of the Notice will be served on opposing counsel and filed with the Clerk of Court of the Civil District Court for the Parish of Orleans, State of Louisiana, as provided by law, to effect the removal of the state court action.

6.      This case is removable because:

a.      A significant and substantial component of Plaintiff's state law claims requires the interpretation of federal law, and Plaintiff's right to relief under one or more causes of action asserted depends upon resolution of a substantial question of federal law, and therefore, federal question jurisdiction applies;

b.      Plaintiff asserts a general maritime claim, and a recent revision to 28 U.S.C. § 1441(b) makes such claims removable;

c.      To the extent the Plaintiff has any right to proceed with this lawsuit, the action is subject to the Class Action Fairness Act ("CAFA");

d.      The Outer Continental Shelf Lands Act applies; and

e.      Federal enclave jurisdiction applies.

Each of these reasons, independently and together, supports removal and this Court's jurisdiction.

## GROUNDS FOR REMOVAL[1]

**I.      Removal Is Proper Under 28 U.S.C. §§ 1331 and 1441(a) Because the Petition Alleges Claims that "Arise Under" Federal Laws and Regulations.**

7.      A district court may exercise original federal jurisdiction over any civil action "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Under Section 1331, federal jurisdiction is present when a plaintiff's well-pleaded complaint

---

[1]      Without waiving any arguments in support of removal, Chevron sets forth below a brief explanation of the reasons removal is proper.

demonstrates that (a) "federal law creates [one or more] cause[s] of action" alleged by plaintiff or (b) "plaintiff's right to relief [under one or more causes of action] necessarily depends on resolution of a substantial question of federal law." *Singh v. Duane Morris LLP*, 538 F.3d 334, 337-38 (5th Cir. 2008). "A single claim over which federal-question jurisdiction exists is sufficient to allow removal." *Broder v. Cablevision Systems Corp.*, 418 F.3d 187, 194 (2d Cir. 2005). In this case, federal jurisdiction is present under both of the foregoing grounds.

8.     Plaintiff alleges in its Petition that "all" of the claims asserted therein "arise and are alleged . . . under Louisiana law." Pet., ¶ 9. For federal jurisdiction purposes, however, this Court may not take Plaintiff's allegations at face value, and must instead undertake a careful examination of the facts and legal theories giving rise to those claims. *See, e.g., Frank v. Bear Stearns & Co.*, 128 F.3d 919, 922 (5th Cir. 1997) ("A federal court may find that a plaintiff's claims arise under federal law even though the plaintiff has not characterized them as federal claims."); *Hawkins v. Nat'l Ass'n of Sec. Dealers Inc.*, 149 F.3d 330, 332 (5th Cir. 1998) (finding federal question jurisdiction where "[plaintiff's] claims . . . , though carefully articulated in terms of state law, [were] actions at law seeking to enforce liabilities or duties created by federal securities laws").

9.     Plaintiff's claims are created by, or necessarily require the resolution of disputed issues of, federal laws and regulations. Following its factual allegations purporting to describe "The Crisis," "The Cause," and "The Costs" flowing from Defendants' activities, the Petition sets forth what Plaintiff acknowledges to be the "longstanding and extensive regulatory framework" governing Defendants' activities at issue. Pet., ¶ 8. In describing "the relevant components of this regulatory framework," the Petition identifies the following federal statutes and accompanying regulations:

        a.      The Rivers and Harbors Act of 1899 ("RHA"). This Act, the Petition states, grants the U.S. Army Corps of Engineers (the "U.S. Army Corps") the "exclusive authority to permit modification of navigable waters of the United States." Pet., ¶ 9.1. In conjunction with this grant of authority, the RHA prohibits both "the unauthorized alteration of" or "injury to" the "levee systems and other flood control measures built by the United States." *Id.* The Petition also refers to the U.S. Army Corps' regulations issued pursuant to, *inter alia*, the RHA, which establish a federal permitting program applicable to Defendants' "activities at issue in the lawsuit." Pet., ¶ 9.2 (citing regulations "promulgated . . . by the Corps," including "Part 209 — Rules Relating to Administrative Procedure [*i.e.*, 33 C.F.R. Part 209]").

        b.      The Clean Water Act of 1972 ("CWA"). The CWA supplemented and extended the U.S. Army Corps' existing permitting authority, particularly in CWA § 404 and related regulations, and required coordination with the EPA Administrator in exercising that authority. *See* 33 U.S.C. § 1344(a) (U.S. Army Corps "may issue permits . . . for the discharge of dredged or fill material into . . . navigable waters"); *see also, e.g.,* 33 C.F.R. § 320.3(a) (U.S. Army Corps may "deny, prohibit, restrict or withdraw the use of any dredged area as a disposal site"). As alleged in the Petition, this federal permitting authority obligates Defendants, in connection with their alleged activities, to (i) "[m]aintain canals and other physical alterations as originally proposed," (ii) "[r]estore dredged or otherwise modified areas to their natural state upon completion of their use or abandonment," and (iii) "[m]ake all reasonable efforts to minimize the environmental impact" of their activities. Pet., ¶ 9.2.

        c.      The Coastal Zone Management Act of 1972 ("CZM"). This Act, along with "related Louisiana coast zone regulations," imposes in connection with the federal RHA and CWA permitting authority what the Petition describes as a "litany of duties and obligations

expressly designed to minimize the adverse ecological, hydrological, topographical, and other environmental effects" allegedly associated with Defendants' activities. Pet., ¶ 9.3.

10.     By contrast, the "relevant components" of the regulatory framework cited in the Petition that arise under Louisiana law consists of two state programs, each of which is substantially more limited than the federal statutes and regulations described above. Pet., ¶¶ 9.3 & 9.4.

    a.     The Petition refers to regulations issued by the Louisiana Office of State Lands ("State Lands Office") governing "rights of way granted across state-owned land and waters." Pet., ¶ 9.3. As shown by the State Lands Office's online database of rights-of-way granted under this program, the rights-of-way granted to Defendants by the State Lands Office consist almost entirely of pipeline rights-of-way. While pipeline rights-of-way can implicate canals, these regulations are much more limited than the federal regulations discussed above. *See* Rights of Way at http://www.doa.louisiana.gov/slo/rowdataaccess.htm and Pet., ¶ 6.3.

    b.     The Petition also refers to the State's Coastal Zone Management Program ("CZMP") regulations "related" to the federal CZM program that, in permits authorizing "oil and gas exploration and production activities," impose "duties and obligations" to minimize the environmental and ecological impacts flowing therefrom. Pet., ¶ 9.4. Because these regulations did not take effect until 1980, they cannot apply to Defendants' numerous projects and activities taking place before that time. Moreover, Louisiana's coastal use permits ("CUPs") are issued in conjunction with the RHA and CWA permits issued by the U.S. Army Corps and, in the case of many of the CUPs identified in the Petition, impose little or no obligations of any relevance to Plaintiff's claims beyond a generic requirement to obey other applicable federal and state laws. *See infra.*

11.     Plaintiff further alleges that the "permitting schemes" identified in its Petition create "numerous . . . obligations" between "Defendants and governmental bodies" of which "Plaintiff is the third-party beneficiary." Pet., ¶ 11. The permitting schemes referenced in the Petition consist of (1) the RHA permitting program administered by the U.S. Army Corps, (2) the CWA permitting program administered by the U.S. Army Corps in conjunction with the EPA Administrator, (3) Louisiana's State Lands Office regulations, and (4) Louisiana's CZMP.

12.     Each of the causes of action alleged in the Petition, with the exception of Count 2, incorporates specific allegations asserting that Defendants' activities violate "the regulatory framework outlined above," including the "express obligations and duties contained in the permit(s) and right(s)-of-way" governing Defendants' activities at issue in this action. Pet., ¶¶ 13, 21, 29, 34, 39.

A.     **Plaintiff's Claims Are "Created By" Federal Law.**

13.     Federal jurisdiction exists, and removal is proper, when a plaintiff's petition alleges a claim for which federal law is the "law that creates the cause of action." *Franchise Tax Bd. v. Const. Laborers Vac. Trust,* 463 U.S. 1, 9, 14 (1983); *see Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 312 (2005) (removal proper when plaintiff pleads a "cause of action created by federal law"). Plaintiff's Petition here asserts an array of such claims.

14.     In Count 6 ("Breach of Contract — Third Party Beneficiary"), the Petition alleges that Defendants have violated "express obligations and duties contained in the permit(s) and right(s) of way identified in the Exhibits hereto and governing Defendants' activities at issue," and that Plaintiff is entitled to enforce such permits and rights-of-way as a "third-party beneficiary." Pet., ¶¶ 39-40. Plaintiff's alleged third-party beneficiary status with respect to such permits and rights-of-way arises because the regulatory framework under which they were

issued, and their express terms and conditions, "manifest an intent to confer a direct and certain benefit to [Plaintiff] and/or the levee districts that it governs." Accordingly, through Count 6, Plaintiff seeks to enforce the "express obligations and duties" contained in such permits and rights-of-way directly against the Defendants.

15.     Exhibit F to the Petition, entitled "Dredging Permit Spreadsheet," identifies by "permit number," date and permittee (among other information) various dredging permits granted to Defendants that allegedly govern their activities challenged in this action. No less than 75 of the listed permits are purely federal permits issued by the U.S. Army Corps pursuant to the RHA and/or CWA. *See* Pet., Ex. F (listing permits). In general, the federal permits listed in Exhibit F were issued before Louisiana's Coastal Management Program regulations came into effect in 1980. *See* Louisiana Coastal Resources Program, Final Environmental Impact Statement (1980) (copy attached hereto as Exhibit C). Before the Coastal Management Program, the State of Louisiana lacked authority to require, or issue, coastal use permits for dredging operations in the coastal zone of Louisiana.

16.     Even after Louisiana's Coastal Management Program took effect, the federal RHA and CWA permitting programs continued in effect, and parties that obtain a coastal use permit from the State generally cannot proceed with their planned project until a federal permit is also obtained. *See, e.g.,* State of Louisiana Department of Natural Resources, Frequently Asked Questions (FAQ) (hereafter, "DNR FAQ"), available at hhtp://dnr.louisiana.gov/index.cfm?md =pagebuilder&tmp=home&pid=420, at *7 ("When I receive my permit from Office of Coastal Management, may I begin work? Following the determination from Office of Coastal Management, work may begin only after obtaining any necessary permit(s) from the U.S. Army Corps of Engineers, including any required mitigation . . . ."); *id.* at *5 ("Has Louisiana assumed

404 responsibility from the U.S. Army Corps of Engineers?  No.  While the State Coastal Use Permit and Federal [CWA]404/[RHA]10 permit processes are similar, they were established under different federal laws").  As set forth in 33 C.F.R. Parts 320, 322 & 324, in acting upon requests for federal permits under the RHA and CWA, the U.S. Army Corps independently addresses what steps, if any, a permittee should be required to take to minimize or mitigate impacts on coastal resources and the environment from its planned project, including impacts upon nearby wetlands.  *See* 33 C.F.R. § 320.4(b) (describing consideration given to a project's "[e]ffect on wetlands"); *e.g.,* 33 C.F.R. § 320.4(a) ("The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest.").  Although the U.S. Army Corps and Louisiana's DNR have made arrangements to allow applicants to submit a single application seeking both a RHA and CWA permit from the U.S. Army Corps and a Coastal Management Program permit from the DNR, the permitting decisions made by these agencies are conducted separately.  *See* 33 C.F.R. §320.4(j).

17.    In Paragraph 11, the Petition refers explicitly to the U.S. Army Corps' RHA and CWA permitting programs as creating obligations "between Defendants and governmental bodies of which Plaintiff is the third-party beneficiary."  Pet., ¶ 11 (referring to "above-mentioned permitting schemes;" the Corps' RHA and CWA permitting programs are described in ¶¶ 9.1 and 9.2).  And, in Paragraph 6.11, the Petition describes Exhibit F as containing only "a sampling of permits" with which Defendants "are associated." *Id.,* ¶ 6.11.  A fair reading of the Petition thus confirms that, even for the period after Louisiana's Coastal Management Program was established, the permits that Plaintiff seeks to enforce against the Defendants include the federal RHA and CWA permits issued by the U.S. Army Corps.

18.     In sum, dozens of the permits listed in Exhibit F as governing Defendants' activities at issue in this action were considered, approved and issued by a federal agency solely pursuant to federal law.   In addition, as to the projects undertaken after 1980, the Petition explicitly alleges Plaintiff's purported right to enforce the federal permits issued under the RHA and CWA against Defendants as a third-party beneficiary.   In both cases, the "express obligations and duties contained in the permit(s)" and Plaintiff's alleged right as a third-party beneficiary to enforce these obligations and duties arose solely under federal law.   It is axiomatic that a lawsuit "arises under" federal law when federal law is the "law that creates the cause of action." *Franchise Tax. Bd.*, 463 U.S. at 8-9.   When a plaintiff's petition alleges claims created by federal law, nothing more is required to justify removal.   On this basis alone, Defendants are entitled to remove Plaintiff's lawsuit pursuant to 28 U.S.C. §§ 1331 and 1441(a).

**B.      Plaintiff's Claims Necessarily Depend on Disputed Issues of Federal Law.**

19.     In *Grable*, the Supreme Court established the prevailing test to determine whether federal issues "embedded in" what is otherwise a state law cause of action permit removal. Federal question jurisdiction exists, and removal to federal court is proper, when "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314.   In *Singh v. Duane Morris LLP*, the Fifth Circuit formulated the following four-part test:

> federal question jurisdiction exists where (1) resolving a federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities.

538 F.3d at 338.   Under this test, federal jurisdiction exists here.

20.     The breadth of the relief Plaintiff here seeks from oil and gas industry members is extraordinary.   Notwithstanding the extensive body of permits issued by federal and state agencies that authorized Defendants' construction, and continued operation, of the "network of canals" needed to "access" and conduct ongoing oil and gas activities along the Louisiana coast, Plaintiff seeks an injunction requiring Defendants to "backfill[] and revegetat[e] each and every such canal," and to conduct "all manner of abatement and restoration activities," including "extensive wetland creation, reef creation, land bridge construction, hydrologic restoration," across a broad "Buffer Zone" located almost entirely outside of territories managed by the three levee districts that Plaintiff governs. Pet., ¶¶ 5.3, 6.3, 7.2.1.  Plaintiff also seeks to shift onto Defendants the extensive OMRR&R and O&M costs from the far-reaching Hurricane and Storm Damage Risk Reduction System ("Risk Reduction System") that state law has allocated to Plaintiff, as well as the "[c]onstruction cost-share expenses" associated with the Risk Reduction System and the costs of "ensuring" that the System's components "provide at least 100-year level storm protection." *Id.*, ¶¶ 7.3, 7.6.

21.     In an attempt to justify the requested relief, the Petition predicates each of Counts 1, 3, 4, 5, and 6 on an alleged statutory duty found in the federal RHA that, if accepted, would extend Defendants' purported liability far beyond what could be justified under the ordinarily applicable state law concepts of legal duty (duty-risk analysis) and proximate cause, which otherwise would govern its claims of negligence, strict liability, and public and private nuisance. As spelled out in Paragraph 9.1, Plaintiff seeks to draw this alleged duty out of the RHA's statutory language making it "unlawful" to "in any manner whatever impair the usefulness of any . . . sea wall, . . . levee, . . . or other work built by the United States . . . to prevent floods." Pet., ¶ 9.1. Under Plaintiff's reading, this statutory language, coupled with its incorporation into federal

and state permits and rights-of-way by means of generalized language requiring permit holders to obey all applicable federal and state laws, requires Defendants to forego any activities that may "impair the Buffer Zone" of existing coastal wetlands extending far outside the territory of the three levee districts managed by Plaintiff. *Id.*, ¶ 39; *see id.*, ¶ 9.1 (characterizing the RHA as prohibiting any "injury to levee systems and other flood control measures built by the United States"). To satisfy this alleged duty, the Petition alleges, Defendants must forego any actions that may create "land loss" or "increased submergence in the Buffer Zone" and, to redress any past actions that allegedly produced such results, Defendants are obligated "to restore the ecosystem to its natural state." *Id.*, ¶¶ 6.7, 6.10. In a video interview on July 24, 2013, Plaintiff's Vice-President, John Barry, confirmed that Plaintiff's lawsuit rests upon "federal law [that] prohibits any activity that will impair the effectiveness of a levee," and that actions by Defendants resulting in "any increase in storm surge" allegedly violate this federal duty by "mak[ing] an existing levee less effective that it would otherwise be." Mark Schleifstein, *Historic Lawsuit Seeks Billions in Damages from Oil, Gas, Pipeline Industries for Wetlands Losses*, NOLA.Com, July 24, 2013, http://www.nola.com/environment/index.ssf/2013/07/historic_east_bank_levee_authov.html (video embedded in article).

22.     Count 6 of the Petition seeks to enforce this alleged statutory duty directly against Defendants. In language echoing the quoted portion of the RHA, the Petition alleges that "express obligations and duties contained in" permits and rights-of-way granted to Defendants "require that Defendants not impair the Buffer Zone." Pet., ¶ 39. In addition to the quoted portion of the RHA, the Petition alleges that pursuant to CWA regulations and permits issued pursuant thereto, Defendants are required to maintain canals and other physical alternations as originally proposed, to restore dredged or otherwise modified areas to their natural state upon

completion of their use or their abandonment, and to make all reasonable efforts to minimize the environmental impact of Defendants' activities. Notably, however, the Petition cites no provision or portion of any actual regulation or permit that sets forth any such requirement, and Defendants' examination of many of the permits listed in Exhibit F to the Petition has located no such requirement. Instead, as illustrated in the following exemplar permits, it is apparent that Plaintiff purports to locate Defendants' alleged duty and obligations under permits in the generic language routinely included in such documents requiring the permittee to obey "all applicable federal and state law." *See, e.g.*, C.U.P. No. P8045, issued December 1980, ¶ 7 ("All terms of the permit shall be subject to all applicable federal and state laws and regulations."); C.U.P. No. P830380, issued May 1983, ¶ 7 ("All terms of the permit shall be subject to all applicable federal and state laws and regulations."); C.U.P. No. P860116, issued June 1986, ¶ 7 ("All terms of the permit shall be subject to all applicable federal and state laws and regulations.") (copies attached hereto as Exhibit D). By seeking to enforce against Defendants an alleged statutory duty arising directly from the federal RHA, Count 6 of the Petition "necessarily raise[s] a stated federal issue." *Grable*, 545 U.S. at 314; *see Singh v. Duane Morris LLP*, 538 F.3d at 338 (same). This federal issue in itself provides a sufficient basis to remove Plaintiff's lawsuit.

23.    In addition, in each of Count 1 ("Negligence"), Count 3 ("Natural Servitude of Drain"), Count 4 ("Public Nuisance"), and Count 5 ("Private Nuisance"), the Petition relies on the alleged RHA statutory duty not to "impair" or "injure" any "sea wall" or "levee" built by the United States and the alleged requirements of CWA regulations and permits to expand Defendants' alleged liability under these state law causes of action far outside the outer limits for such claims. The Petition does so by incorporating into each of these Counts allegations that Defendants' activities violated "the express obligations and duties contained in" permits granted

to Defendants, coupled with allegations portraying such alleged violations as actionable in themselves under these Counts. Pet., ¶¶ 13, 21, 29, 34, 39. Moreover, each of these Counts incorporate by reference Plaintiff's claim to be entitled to enforce the permits "express obligations and duties" as a "third-party beneficiary." *Id.*, ¶¶ 11, 12, 20, 26, 33, 38, 40. The Petition's reliance on an alleged federal statutory duty to expand the outer boundaries of Defendants' alleged liability under these Counts necessarily raises a "stated federal issue" that must be resolved to decide these claims. *See Grable*, 545 U.S. at 314.

24.    Each element of the *Grable* test is satisfied here.

a.    First, a plaintiff's claim "necessarily raises" a federal law issue when a plaintiff cannot prove the claim it has alleged without prevailing on the embedded federal law issue. *Singh*, 538 F.3d at 338. Plaintiff here cannot establish the duty element of the claims alleged in Counts 1, 3, 4, 5, and 6 of its Petition without prevailing on its view of Defendants' alleged statutory duty under the federal RHA.

b.    Second, the determination whether a federal issue is "actually disputed" rests on whether the parties genuinely disagree on the meaning or requirements imposed by the federal law at issue. *See Boyle*, 2012 WL 289881, at *3. There is no question that Plaintiff's interpretation of the federal RHA giving rise to its claims is genuinely disputed. Defendants strongly dispute Plaintiff's reading of the federal statutory language cited in the Petition, and also dispute Plaintiff's claim to be entitled to enforce this statutory language as a third-party beneficiary of the permits governing Defendants' oil and gas activities. In addition, Defendants dispute that they are required pursuant to CWA regulations or permits to maintain canals and other physical alternations as originally proposed, to restore dredged or otherwise modified areas

to their natural state upon completion of their use or abandonment, or to make all reasonable efforts to minimize the environmental impact of Defendants' activities.

            c.      Third, federal question jurisdiction requires that a federal issue is "a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, 545 U.S. at 314. In making this determination, courts frequently consider the materiality of the disputed federal law issue in resolving plaintiff's claim for relief. *Bobo v. Christus Health*, 359 F. Supp. 2d 552, 557 (E.D. Tex. 2005) (citing *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 917 (5th Cir. 2001)); *see also Clauer v. Heritage Lakes Homeowners Ass'n, Inc.*, No. 4:09–cv–560, 2010 WL 446545, at *3 (E.D. Tex. 2010) (federal issues were substantial where plaintiffs' asserted rights were created by federal law and required the court to interpret federal law, and claims turned on answers to federal statutory questions).

            Plaintiff has sued virtually an entire industry for extraordinary injunctive relief "in the form of abatement and restoration of the coastal land loss at issue, including, but not limited to, backfilling and revegetating each and every canal Defendants dredged, used and/or for which they bear responsibility, as well as all manner of abatement and restoration activities determined to be appropriate, including, but not limited to, wetlands creation, reef creation, land bridge construction, hydrologic restoration, shoreline protection, structural protection, bank stabilization, and ridge restoration." Pet., Prayer (c). All of these activities fall into the realm of a federal regulatory framework that is pervasive and comprehensive. None of these forms of relief can be performed without federal regulatory involvement and permission. In addition, all of these activities, if ordered, will necessarily interfere with the exploration, production, and transportation of oil and natural gas in interstate commerce—a matter of national concern. Moreover, all of these activities, if ordered, will create a high risk of being inconsistent with or

interfering with federal energy policy and/or ongoing coastal restoration projects sponsored in large part by the federal government.

In addition, accepting Plaintiff's premise that the RHA's language barring private parties from "impair[ing] the usefulness of" a levee or sea wall makes Defendants liable for any and all "land loss" or "increased submergence" in coast lands proximate to a flood control authority such as Plaintiff, would dramatically expand the legal obligations to which Defendants have heretofore been subject, and impose potentially catastrophic liability upon many Defendants. It is precisely this type of issue that "justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312. Allowing removal of Plaintiff's lawsuit to permit a federal court to resolve this issues goes to the heart of the reasons why federal "arising under" jurisdiction exists.

d.      Fourth, there is no prospect that allowing removal of Plaintiff's lawsuit will affect in any way, much less significantly, the caseload with which federal courts must deal. Although Plaintiff's lawsuit, viewed as a single case, is no doubt a significant one, there can be few other subsequent cases likely to be affected by this Court's resolution of the removal issue presented here.

## II.    Removal Is Proper Under 28 U.S.C. §§ 1333 and 1441(a) Because the Petition Asserts General Maritime Claims.

25.      "A federal court's authority to hear cases in admiralty flows initially from the Constitution, which 'extend[s]' federal judicial power 'to all Cases of admiralty and maritime Jurisdiction.'" U.S. Const., Art. III, § 2; *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995). "Congress has embodied that power in a statute giving federal district courts 'original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction . . . .'" 28 U.S.C. § 1333(1); *see also Grubart*, 513 U.S. at 531.

26.     A party seeking to invoke federal admiralty jurisdiction under 28 U.S.C. § 1333(1) over a tort claim "must satisfy conditions both of location and of connection with maritime activity." *Grubart*, 513 U.S. at 534.   In applying the location test, a court "must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* at 534 (*citing* 46 U.S.C. App. § 740 (now 46 U.S.C. § 30101)).   In applying the connection test, a court must first assess the "general features of the type of incident involved" to determine if the incident has "a potentially disruptive impact on maritime commerce," and then determine whether the character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. *Grubart*, 513 U.S. at 534.

27.     Both tests are easily satisfied here.   The torts alleged by Plaintiff have allegedly occurred and allegedly continue to occur on navigable waters in the form of (1) the canal network described in the Petition, and (2) the alleged dredging work on navigable waters (from dredging by vessels) undertaken to create the canals. *See, e.g.,* Pet., ¶ Introduction ("[the oil and gas industry] has created an extensive network of oil and gas access and pipeline canals that slashes the coastline at every angle"); *id.* ¶ 6.5 ("[t]he oil and gas canal network . . . has been ranked among the primary causes of coastal land loss"); *id.* ¶¶ 6.6, 6.6.1, 6.6.2 ("the canal network . . . ha[s] been identified as causing the following, all of which lead to coastal land loss: vegetation die-off; sedimentation inhibition; erosion; and submergence"); and *id.* ¶ 6.12 ("[d]efendants also exacerbate direct land loss by failing to maintain the canal network and banks of the canals that Defendants have dredged, used or otherwise overseen"); *see also, e.g., id.* ¶ 6.3, 6.4, 6.7, 6.7.1, 6.7.3, 6.7.4, 6.10, 6.12.

28.    By dredging these canals and/or allegedly failing to maintain them, Defendants are alleged to have potentially disrupted the navigability of the existing channels and bodies of water that they were dredged to connect.   Moreover, by allegedly failing to maintain these canals, Defendants are alleged to have potentially disrupted the navigability of the newly dredged network of (navigable) canals themselves.

29.    For these reasons, Plaintiff's claims sound in maritime tort, *Grubart*, 513 U.S. at 534, and this lawsuit is a case of Admiralty and Maritime Jurisdiction arising under Article III, section 2 of the United States Constitution, 28 U.S.C. § 1333, 46 U.S.C. § 30101, and Rule 9(h) of the Federal Rules of Civil Procedure.

30.    Before January 2012, courts interpreted 28 U.S.C. § 1441(a) to mean that a general maritime claim could be removed only when there was a separate basis for federal jurisdiction.   But 28 U.S.C. § 1441 was amended in 2011 as a part of the Federal Courts Jurisdiction and Venue Clarification Act of 2011, H.R. 394, P.L. 112-63.   The amendment removes the language in section 1441(a) that had been interpreted as barring removal of federal maritime cases. *See Ryan v. Hercules Offshore, Inc.*, No. H-12-3510, 2013 WL 1967315 (S.D. Tex. May 13, 2013); *Wells v. Abe's Boat Rentals Inc.*, No. H-13-1112, 2013 WL 3110322 (S.D. Tex. June 18, 2013).

31.    Section 1441(a) currently states: "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."   Accordingly, the case is removable because it asserts general maritime claims.

### III.   Removal Is Proper Under the Class Action Fairness Act.

32.    CAFA gives federal courts jurisdiction over not just "class actions" but also "mass actions," which are defined as "any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact." 28 U.S.C. § 1332(d)(11)(B)(i). If a state court mass action meets the requirements of section 1332(d)(11)(A), it is removable.   Here, all of those requirements are satisfied and removal is proper.

33.    Each of the six causes of action in the Petition requests money damages and injunctive relief. *See, e.g.*, Pet., ¶¶ 14, 19, 25, 32, 37 and 42. Plaintiff also purports to seek attorney's fees. This relief satisfies the monetary requirement of CAFA.

34.    Chevron denies that Plaintiff has any authority to bring this action. To the extent that any such authority exists, the lawsuit on its face purports to seek damages and injunctive relief on behalf of the residents of southeast Louisiana in the Orleans, Lake Borgne, and East Jefferson levee districts, for purported damage to the Louisiana coastline from decades of alleged oil and gas activities. *See* Pet., ¶ 5.1 (acknowledging the "primary objective" is to "protect[] the residents, businesses and properties within [the flood protection] system from the destructive flooding that hurricane storm surges and waves introduce"); *see also* Minutes of the Southeast Louisiana Flood Protection Authority-East Board Meeting of Friday, June 14, 2013 and Resolution No. 06-13-04 (attached as Exhibit E) (The lawsuit is "on behalf of itself and the levee districts within its jurisdictions, regarding claims for damages due to land loss and erosion, for the benefit of and on behalf of the residents within its jurisdiction."); Interview of Plaintiff's Vice President John Barry ("we had this obligation to protect people's lives and take care of the flood protection system, and our ability to protect people's lives and property is severely compromised by the loss of coastal land") (attached as Exhibit F and available at

http://www.correntewire. com/louisiana_flood_protection_board_sues_big_oil_for_wetlands
_loss_harry_shearer_interviews_john_barry).

35.     Because there are more than 100 residents and businesses in the Greater New
Orleans area, the numerosity requirement of a CAFA mass action removal is satisfied. 28 U.S.C.
§ 1332(d)(11)(B)(i); *see also Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418, 429
(5th Cir. 2008) (holding that when there is a single plaintiff, but damages relate to numerous
individuals, CAFA's numerosity requirement is satisfied); *Mississippi ex rel. Hood v. AU
Optronics Corp.*, 701 F.3d 796, 801 (5th Cir. 2012).

36.     Plaintiff proposes that this single lawsuit force Defendants to pay money and
restore coastal areas to protect all of the residents and businesses in the Greater New Orleans
area.     CAFA's commonality requirement is therefore also satisfied.     28 U.S.C.
§1332(d)(11)(B)(i).

37.     CAFA provides that federal courts have jurisdiction over anyone whose claims
satisfy the $75,000 matter in controversy requirement of 28 U.S.C. 1332(a). In this lawsuit, the
Plaintiff seeks over $75,000, as would the residents and businesses who are the real parties in
interest here. Moreover, the amount in controversy can be determined based upon the value of
the right that a plaintiff seeks to protect, which is also more than $75,000 in this lawsuit. *Hunt v.
Washington State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). In fact, there is no question
that the Plaintiff seeks to have Defendants pay over $5 million. *See* Pet., ¶¶ 14, 19, 25, 32, 37,
42; Mark Schleifstein, *Historic Lawsuit Seeks Billions in Damages From Oil, Gas, Pipeline
Industries for Wetlands Losses*, NOLA.com, July 24, 2013 (attached as Exhibit G, available at
http://www.nola.com/environment/index.ssf/2013/07/historic_east_bank_levee_autho.html); *see
also* John Barry Interview August 4, 2013 (attached as Exhibit F).

38.     The Plaintiff's principal place of business is in Louisiana, *see* Pet., ¶ 1.1, and at least some residents and businesses who are the real parties in interest are also citizens of Louisiana. Chevron is incorporated in the State of Delaware, with its principal place of business in San Ramon, California. The minimal diversity requirement is satisfied. 28 U.S.C. §§ 1332(d)(2), 1332(d)(11)(A).

39.     None of the exceptions to CAFA removal apply because (1) the claims did not arise out of a single event; (2) the claims were not "joined upon motion of a defendant;" (3) it cannot be said that all of the claims "are asserted on behalf of the general public . . . pursuant to a State statute specifically authorizing such action;" and (4) this is not a case in which claims were consolidated "solely for pretrial proceedings."

## IV.     Removal Is Proper Under 43 U.S.C. §§ 1349(b)(1) and 1441(a) Because the Levee Action Is a Case Arising in Connection with Operations Conducted on the Outer Continental Shelf.

40.     The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.* ("OCSLA"), provides that "the subsoil and seabed of the Outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition." 43 U.S.C. § 1332(1). The OCSLA asserts exclusive federal question jurisdiction over the Outer Continental Shelf by extending "[t]he Constitution and laws and civil and political jurisdiction of the United States . . . [to the Outer Continental Shelf] and all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom." 43 U.S.C. § 1333(a)(1).

41.     A plaintiff does not need to expressly invoke the OCSLA for it to provide a basis for federal jurisdiction. *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir.1988).

42.    43 U.S.C. § 1331(m) provides that "[t]he term 'production' means those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, *transfer of minerals to shore*." *Id.* (emphasis added).

43.    43 U.S.C. § 1349(b)(1) provides that "the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with [ ] any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."

44.    The Petition alleges damages caused by pipelines and canals dredged to accommodate pipelines, including pipelines running through Louisiana's coastline and connecting oil and gas drilling rigs and drilling platforms operating on the Outer Continental Shelf to onshore facilities and delivering oil and gas derived from wells accessed by these rigs and platforms to these onshore facilities.

45.    This case arises out of and in connection with operations conducted on the Outer Continental Shelf that involve production of the minerals of the subsoil and seabed of the Outer Continental Shelf.  Accordingly, 43 U.S.C. § 1349(b)(1) grants original jurisdiction in federal court over this action.

46.    Under 28 U.S.C. § 1441(a), "except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

47.     Because this is a case covered by 43 U.S.C. § 1349(b)(1), this civil action is removable to this Court on this independent ground alone. *See Barker v. Hercules Offshore, Inc.*, 713 F.3d 208 (5th Cir. 2013).

**V.     Removal Is Proper Based on Federal Enclave Jurisdiction Because This Case Arose in Part on Multiple Federal Enclaves.**

48.     "Federal enclave jurisdiction is a subspecies of federal question jurisdiction, which is a form of subject matter jurisdiction vested in federal district courts by 28 U.S.C. §1331." *Lawler v. Miratek Corp.*, No. 09-252, 2010 WL 743925, at *2 (W.D. Tex. Mar. 2, 2010). "Because Congress has been granted exclusive legislative power over federal enclaves, federal courts have subject matter jurisdiction over actions that arise on federal enclaves." *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

49.     There are three requirements for federal enclave jurisdiction to apply. First, the United States must have acquired land in a state for the purpose of erecting forts, magazines, arsenals, dockyards, or other needful buildings, and this federal land must have some connection to the claims in the case. *Wood*, 2011 WL 1870218, at *2. The entire claim need not be confined to a federal enclave. Federal jurisdiction is conferred if some of the events or claims alleged in the complaint occurred on a federal enclave. *See, e.g., Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010). Indeed, at least one federal district court in the Fifth Circuit has held that when the alleged injury is indivisible, if any of the alleged injury or claims arose on a federal enclave, then the entire claim is subject to federal enclave jurisdiction. *See, e.g., Reed v. Fina Oil & Chem. Co.*, 995 F.Supp. 705, 713 (E.D. Tex. 1998).

50.     The second requirement is that the state legislature must have consented to the jurisdiction of the federal government. *See Wood*, 2011 WL 1870218, at *2. The third requirement is that the United States accepted jurisdiction. If the government acquired the

property before 1940, acceptance is presumed. *See United States v. Gabrion*, 517 F.3d 839, 848 (6th Cir. 2008). If the property was acquired after 1940, the federal government must accept jurisdiction "by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated." *Wood*, 2011 WL 1870218, at *2 (quoting 40 U.S.C. § 3112(b)).

51. All three requirements are satisfied in this case. The first requirement is met by showing that the federal government owns the federal enclaves within the zone at issue in this case, and that these enclaves have some connection to the allegations and claims made by Plaintiff in its Petition. There are multiple federal enclaves in the New Orleans area that both fall into the zone described by Plaintiff and which are connected to the allegations made in the Petition. The Petition includes a large geographic area which Plaintiff claims has been damaged by the alleged torts of the Defendants. For instance, the Petition states that an area it calls the "Buffer Zone" has been negatively affected by the alleged torts and has lost a great deal of coastal land. *See* Pet., ¶¶ 5.3, 5.4. The Petition defines the Buffer Zone as extending "from East of the Mississippi River through the Breton Sound Basin, the Biloxi Marsh, and the coastal wetlands of eastern New Orleans and up to Lake St. Catherine." Pet., ¶ 5.3. The Petition alleges that the alleged torts have led to "extensive weakening of coastal lands and loss of lands in the Buffer Zone." Pet., ¶ 13.

52. Moreover, the Petition has at its heart allegations that activity by the oil and gas defendants has made the levees within the designated zone vulnerable making Plaintiff's job "exponentially more challenging because of the deterioration and disappearance of Louisiana's coastal lands." Pet., Introduction. Plaintiff describes its charge to "'devise and adopt rules and regulations for the carrying into effect and perfecting of a comprehensive levee system, having

for its object the protection of the entire territory of the authority from overflow'" Pet., ¶ 4.3 (citing La. R.S. 38:330.2(G)). Included in the Petition's list of levees over which Plaintiff has responsibility are what it deems "federal levees" and "federal floodwalls." Pet., ¶ 4.5. In fact, the Petition lists 48.47 miles of federal levees and 26.79 miles of federal floodwalls in the Orleans District, 36 miles of federal levees and 1.5 miles of federal floodwalls in the Lake Borgne District, and 30 miles of federal levees and 8.7 miles of federal floodwalls in the East Jefferson District.

53.    The geographic area where the alleged harmful activities occurred appears to be an even broader area. Though this area is not defined as precisely in the Petition as the Buffer Zone is, the Petition states that the oil and gas industry's "exploration and development in Louisiana's coastal zone" is what is responsible for the damage to the Buffer Zone. Pet., ¶ 6.1. The Petition alleges that "[t]housands of wells have been drilled in Louisiana" and that "oil and gas production and pipeline companies together dredged a network of canals to access oil and gas wells and to transport the many products and by-products of oil and gas production." Pet., ¶¶ 6.2, 6.3. The Petition also notes that this has resulted in "an extensive network of thousands of miles of oil and gas access and pipeline canals." *Id.* at ¶ 6.4. The Petition likewise identifies a number of "wells, pipelines, and a sampling of permits and/or rights of way, with which Defendants are associated." *Id.* at ¶ 6.11 The locations of these wells, pipelines, permits and rights-of-way are far-ranging along the Gulf Coast south and east of New Orleans.

54.    With regard to the relevant time frame, the Petition alleges that "[t]he oil and gas industry began exploration and development in Louisiana's coastal zone in the early 1900s, prompting nearly 100 years of profitable oil and gas production. Pet., ¶ 6.1. Moreover, the

Petition states that "[s]ince the 1930s, land loss in the Mississippi Deltaic Plain has been extraordinary in scale and is anticipated to grow at an aggressive pace." *Id.* at ¶ 5.4.

55.     Any federal enclaves that fall within the Buffer Zone and that have been affected by the loss of coastal lands have a sufficient connection with the case at issue here to meet the first requirement. Similarly, any federal enclaves in the New Orleans area where oil and gas activities have occurred over the last seventy years also meet the first requirement of having a sufficient connection to the claims in this case.

56.     The second requirement — that the removing defendant must show that the state legislature has consented to the jurisdiction of the federal government — is also satisfied here. A state may consent to federal jurisdiction by enacting legislation that cedes jurisdiction to the United States. *See Dekalb County, Georgia v. Henry C. Beck Co.*, 382 F.2d 992, 994-95 (5th Cir. 1967); *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 541-42 (1885). Louisiana has passed a statute that cedes jurisdiction to the United States as to all federal lands in the state. It consented to the jurisdiction of the United States by enacting section 52.1(A) of the Louisiana Revised States, which provides in pertinent part:

> The United States in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, may acquire and occupy any land in Louisiana required for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property.

La. Rev. Stat. § 52.1(A). Courts have held that this section explicitly cedes jurisdiction from the State of Louisiana to the United States for land acquired by the United States in Louisiana. *See Wood*, 2011 WL 1870218, at *2. This requirement is thus automatically satisfied as to all federal lands in Louisiana.

57.     The third requirement — that the federal government must have accepted exclusive jurisdiction — is also satisfied for many of the federal enclaves covered by the Petition

because, *inter alia*, many of the enclaves were acquired before 1940. *See Gabrion*, 517 F.3d at 848.

58.     The existence of merely one federal enclave is enough to support federal enclave jurisdiction. Here, numerous federal enclaves in the New Orleans area meet the requirements for the application of federal enclave jurisdiction, including but not limited to:  (1) Chalmette Battlefield (including the Chalmette Monument, Grounds, and National Cemetery); (2) the Jean Lafitte National Historical Park and Preserve, particularly the Barataria Unit; (3) the Breton National Wildlife Refuge; (4) the Naval Support Activity base in Algiers; (5) the Naval Air Station Joint Reserve Base in New Orleans; (6) the Bonnet Carre Spillway; (7) the Big Branch Marsh National Wildlife Refuge; (8) the Mississippi Gulf River Outlet; (9) federal levees and floodwalls; (10) the Bayou Sauvage National Wildlife Refuge; (11) the Delta National Wildlife Refuge; and (12) any number of offshore drilling platforms. Each was acquired by the federal government during the relevant time period, each has a connection to the claims asserted by Plaintiff in the Levee Petition, each has been ceded exclusive federal jurisdiction by the State of Louisiana, and for each, the federal government has accepted exclusive federal jurisdiction pursuant to 40 U.S.C. § 3112(b).  Removal is therefore proper based on federal enclave jurisdiction as well.

Chevron reserves the right to amend or supplement this Notice of Removal.

**WHEREFORE**, Chevron prays that further proceedings in the Civil District Court for the Parish of Orleans, State of Louisiana, be discontinued and that this action be recognized as removed to and pending on the docket of the United States District Court for the Eastern District of Louisiana, as the law in such cases provides.

Respectfully submitted,


**Kean Miller LLP**

Michael R. Phillips (#21020)
mike.phillips@keanmiller.com
909 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone:  (504) 585-3050
Facsimile:  (504) 585-3951

-and-

**Kean Miller LLP**


/s/ L. Victor Gregoire
L. Victor Gregoire (#22400)
victor.gregoire@keanmiller.com
Linda S. Akchin (#17904)
linda.akchin@keanmiller.com
Charles S. McCowan, III (#19699)
trey.mccowan@keanmiller.com
II City Plaza
400 Convention St., Suite 700
Post Office Box 3513 (70821)
Baton Rouge, Louisiana 70802
Telephone: (225) 387-0999
Facsimile: (225) 388-9133

***Attorneys for Defendant,***
***Chevron U.S.A. Inc.***