## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BOARD OF COMMISSIONERS OF THE SOUTHEAST LOUISIANA FLOOD PROTECTION AUTHORITY – EAST** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 13-5410** |
| **TENNESSEE GAS PIPELINE COMPANY, LLC et al** | **SECTION: "G" (3)** |

## ORDER AND REASONS

In this litigation, Plaintiff Board of Commissioners of the Southeast Louisiana Flood Protection Authority—East ("Plaintiff") seeks damages and injunctive relief against ninety-two oil and gas companies whose actions have allegedly caused erosion of coastal lands, leaving south Louisiana increasingly exposed to tropical storms and hurricanes. Plaintiff originally filed suit in Civil District Court for the Parish of Orleans, but Defendants removed the matter to this federal Court. Now pending before the Court is Plaintiff's "Motion to Remand."[1] Having considered the motion, the memoranda in support, the memoranda in opposition, the statements at oral argument, Plaintiff's petition, the notice of removal, and the applicable law, the Court will deny the motion.

Because the Court's specific basis for jurisdiction has the potential to reverberate throughout a number of other considerations in this litigation—particularly, Plaintiff's entitlement, if any, to a jury trial, and choice of law questions—the Court has examined all five bases of jurisdiction raised in Defendants' Notice of Removal.

---

[1] Rec. Doc. 70.

## I. Background

### A.    Factual Background

Plaintiff in this matter is the Board of Commissioners of the Southeast Louisiana Flood Protection Authority—East, individually and as the board governing the Orleans Levee District, the Lake Borgne Basin Levee District, and the East Jefferson Levee District.[2] The Southeast Louisiana Flood Protection Authority (the "Authority") was created by statute in 2006 to further "regional coordination of flood protection."[3] According to Plaintiff, the Authority's "mission is to ensure the physical and operational integrity of the regional flood risk management system, and to work with local, regional, state and federal partners to plan, design and construct projects that will reduce the probability and risk of flooding of the residents within the Authority's jurisdiction."[4]

Defendants are ninety-two oil and gas companies operating in what Plaintiff refers to as the "Buffer Zone."[5] The Buffer Zone "extends from East of the Mississippi River through the Breton Sound Basin, the Biloxi Marsh, and the coastal wetlands of eastern New Orleans and up to Lake St. Catherine."[6]

Plaintiff alleges that Defendants' oil and gas operations have led to coastal erosion in the Buffer Zone, making south Louisiana more vulnerable to severe weather and flooding. According to Plaintiff, "[c]oastal lands have for centuries provided a crucial buffer zone between south Louisiana's communities and the violent wave action and storm surge that tropical storms and

---

[2] Rec. Doc. 1-2 at p. 2.

[3] 2006 La. Sess. Law. Serv. 1st Ex. Sess. Act 1 (S.B. 8) (West) (codified at La. R.S. § 38:330.1(F)(2)(a)).

[4] Rec. Doc. 1-2 at p. 5.

[5] Plaintiff initially named 149 defendants. *See id.* at pp. 25–34. However, only ninety-two defendants remain in this litigation.

[6] *Id.* at p. 7.

hurricanes transmit from the Gulf of Mexico."[7] However, "[h]undreds of thousands of acres of coastal lands that once protected south Louisiana are now gone as a result of oil and gas activities."[8] Specifically, Plaintiff asserts that Defendants have "dredged a network of canals to access oil and gas wells and to transport the many products and by-products of oil and gas production."[9] This canal network, in conjunction with "the altered hydrology associated with oil and gas activities," has caused vegetation die-off, sedimentation inhibition, erosion, and submergence—all leading to coastal land loss.[10] In addition to the initial dredging, Plaintiff maintains that Defendants "exacerbate direct land loss by failing to maintain the canal network and banks of the canals that Defendants have dredged, used, or otherwise overseen."[11] This failure has "caused both the erosion of the canal banks and expansion beyond their originally permitted widths and depths of the canals comprising that network."[12] Looking beyond the alleged effects of the canal network, Plaintiffs identify ten other oil and gas activities that allegedly "drastically inhibit the natural hydrological patterns and processes of the coastal lands"—road dumps, ring levees, drilling activities, fluid withdrawal, seismic surveys, marsh buggies, spoil disposal/dispersal, watercraft navigation, impoundments, and propwashing/ maintenance dredging.[13]

---

[7] *Id.* at p. 2.

[8] *Id.*

[9] *Id.* at p. 9.

[10] *Id.*

[11] *Id.* at p. 11.

[12] *Id.*

[13] *Id.*

B.     **Procedural Background**

On July 24, 2013, Plaintiff filed suit in Civil District Court for the Parish of Orleans, State of Louisiana.[14] In its petition, Plaintiff asserts six causes of action: (1) negligence,[15] (2) strict liability,[16] (3) natural servitude of drain,[17] (4) public nuisance,[18] (5) private nuisance,[19] and (6) breach of contract—third party beneficiary.[20] Plaintiff requests both damages and injunctive relief

> . . . in the form of abatement and restoration of the coastal land loss at issue, including, but not limited to, the backfilling and revegetating of each and every canal Defendants dredged, used, and/or for which they bear responsibility, as well as all manner of abatement and restoration activities determined to be appropriate, including, but not limited to, wetlands creation, reef creation, land bridge construction, hydrologic restoration, shoreline protection, structural protection, bank stabilization, and ridge restoration.[21]

While Plaintiff's six causes of action are all ostensibly state-law claims, Plaintiff contends that "Defendants' dredging and maintenance activities at issue in this action are governed by a longstanding and extensive regulatory framework under both federal and state law specifically aimed at protecting against the deleterious effects of dredging activities."[22] According to Plaintiff, "the relevant components of this regulatory framework . . . buttress the Authority's claims."[23]

---

[14] *Id.* at p. 1.

[15] *Id.* at p. 17.

[16] *Id.* at p. 18.

[17] *Id.* at p. 19.

[18] *Id.* at p. 20.

[19] *Id.* at p. 21.

[20] *Id.* at p. 22.

[21] *Id.* at p. 23.

[22] *Id.* at p. 16.

[23] *Id.*

4

Specifically, Plaintiff points to the River and Harbors Act of 1899, which "grants to the [Army Corps of Engineers] exclusive authority to permit modification of navigable waters of the United States and prohibits the unauthorized alteration of or injury to levee systems and other flood control measures built by the United States."[24] Plaintiff also cites the Clean Water Act of 1972 and accompanying regulations, which require Defendants to "[m]aintain canals and other physical alterations as originally proposed; [r]estore dredged or otherwise modified areas to their natural state upon completion of their use or their abandonment; and [m]ake all reasonable efforts to minimize the environmental impact of the Defendants' activities."[25] Further, Plaintiff references the Coastal Zone Management Act of 1972 and related Louisiana coastal zone regulations that "impose . . . a litany of duties and obligations expressly designed to minimize the adverse ecological, hydrological, topographical, and other environmental effects" associated with oil and gas activities.[26] Finally, Plaintiff cites "[r]egulations and rights-of-way granted across state-owned lands and water bottoms administered by the Louisiana Office of State Lands."[27] According to Plaintiff, "[t]his regulatory framework establishes a standard of care under Louisiana law that Defendants owed and knowingly undertook when they engaged in oil and gas activities."[28] Additionally, Plaintiff avers that these "permitting schemes created numerous individual obligations under Louisiana law between Defendants and governmental bodies of which Plaintiff is the third-party beneficiary."[29]

---

[24] *Id.*

[25] *Id.*

[26] *Id.* at p. 17.

[27] *Id.* at p. 16.

[28] *Id.* at p. 17.

[29] *Id.*

On August 13, 2013, Defendant Chevron U.S.A. Inc. ("Chevron") removed the case to federal court.[30] In its Notice of Removal, Chevron asserts five grounds for federal jurisdiction: (1) Plaintiff's right to relief depends upon the resolution of a substantial question of federal law; (2) Plaintiff asserts a general maritime claim; (3) the lawsuit is subject to the Class Action Fairness Act ("CAFA"); (4) the Outer Continental Shelf Lands Act ("OCSLA") applies; and (5) federal enclave jurisdiction applies.[31]

On September 10, 2013, Plaintiff filed the pending "Motion to Remand."[32] On October 28, 2013, all Defendants filed a "Joint Response in Opposition to the Motion to Remand,"[33] and Defendant Tennessee Gas Pipeline Company, LLC, Gulf South Pipeline Co. LP, Southern Natural Gas Company, and Boardwalk Pipeline Partners, LP (collectively, the "Natural Gas Act Defendants") filed an additional "Response in Opposition to Motion to Remand"[34] addressing jurisdictional issues specific to certain natural gas producers. The Court also received supplemental briefs from HKN, Inc.,[35] White Oak Operating, LLC,[36] Liberty Oil and Gas Corporation,[37] Manti

---

[30] Rec. Doc. 1.

[31] *Id.* at p. 4.

[32] Rec. Doc. 70.

[33] Rec. Doc. 260.

[34] Rec. Doc. 254.

[35] Rec. Doc. 258.

[36] Rec. Doc. 262.

[37] Rec. Doc. 263.

Operating Company,[38] Mosbacher Energy Company,[39] Coastal Exploration & Production, LLC,[40] and Flash Gas & Oil Northeast, Inc.[41] On November 13, 2013, Plaintiff filed an "Omnibus Reply Memorandum in Support of Its Motion to Remand."[42]

The Court heard oral argument on December 18, 2013.[43] Following oral argument, both Plaintiff and Defendants brought supplemental authorities to the Court's attention.[44] In particular, on February 20, 2014, Defendants Chevron U.S.A., Inc., Union Oil Company of California, Chevron Pipeline Co., and Kewanee Industries, Inc. filed a "Notice of Issuance of Supreme Court Judgment," representing that in light of a recent Supreme Court opinion, they were withdrawing their argument that CAFA supplies a basis for federal jurisdiction in this case.[45]

## II. Standard on a Motion to Remand

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and by statute.'"[46] Pursuant to 28 U.S.C. § 1441(a), a defendant may generally remove a civil action filed in state court if the federal court has original jurisdiction over the action.

---

[38] Rec. Doc. 264.

[39] Rec. Doc. 265.

[40] Rec. Doc. 266.

[41] Rec. Doc. 268.

[42] Rec. Doc. 292.

[43] Rec. Doc. 304.

[44] Rec. Doc. 317; Rec. Doc. 331; Rec. Doc. 334; Rec. Doc. 337; Rec. Doc. 344; Rec Doc. 360.

[45] Rec. Doc. 331.

[46] *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

The removing party bears the burden of demonstrating that federal jurisdiction exists.[47] In assessing whether removal was appropriate, the Court "consider[s] the claims in the state court petition as they existed at the time of removal."[48] The Court is guided by the principle, grounded in notions of comity and the recognition that federal courts are courts of limited jurisdiction, that "the removal statute should be strictly construed in favor of remand."[49]

As noted above, in their Notice of Remand, Defendants assert that federal jurisdiction exists based on five grounds: (1) Plaintiff asserts a general maritime claim; (2) federal enclave jurisdiction applies; (3) the Outer Continental Shelf Lands Act ("OCSLA") applies; (4) the lawsuit is subject to the Class Action Fairness Act ("CAFA"); and (5) Plaintiff's right to relief depends upon the resolution of a substantial question of federal law.[50] These five grounds are addressed in turn.

### III. Whether Admiralty Jurisdiction Exists

**A.      Parties' Arguments**

**1.      Plaintiff's Arguments in Support of Remand**

Plaintiff argues the Court does not have admiralty jurisdiction because "[t]he Authority's claims do not constitute general maritime claims, and even if they did, general maritime claims are not removable without a separate basis for federal court jurisdiction."[51] According to Plaintiff, "the

---

[47] *See Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995).

[48] *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002).

[49] *Id.*

[50] Rec. Doc. 1 at p. 4.

[51] Rec. Doc. 70-1 at p. 10.

Petition does not allege that Defendants caused any impediments to navigability or maritime activities."[52]

First, Plaintiff cites the Supreme Court's decision in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*[53] as establishing a two-part test for whether "a maritime nexus sufficient to establish admiralty jurisdiction exists."[54] "[F]irst, a court must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce."[55] "[S]econd, the court must examine the general conduct from which the incident arose to determine whether there is a substantial relationship between the activity giving rise to the incident and traditional maritime activity."[56]

Applying this test, Plaintiff avers that its claims "do not involve 'a potentially disruptive impact on maritime commerce' because neither the impairment of navigability nor impact upon maritime commerce forms any part of the Authority's allegations."[57] Rather, Plaintiff focuses on the "degradation of coast ***lands***, not coastal waterways, through Defendants' oil and gas activities."[58] Citing *Texaco Exploration & Production, Inc. v. AmClyde Engineered Products Co., Inc.*,[59] Plaintiff contends that "claims for damages related to oil and gas production activities, even though they

---

[52] *Id.* at pp. 10–11.

[53] 513 U.S. 527 (1995).

[54] Rec. Doc. 70-1 at p. 11.

[55] *Id.* (citing *Grubart*, 513 U.S. at 534).

[56] *Id.* (citing *Grubart*, 513 U.S. at 534).

[57] *Id.*

[58] *Id.* (emphasis in original).

[59] 448 F.3d 760, 771, *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006).

might occur on navigable waters, have been held to be insufficiently connected to traditional maritime activity . . . ."[60] Alleging that "Defendants' act and omissions have caused land to convert to open water," Plaintiff contends that "quite apart from disrupting navigability, Defendants' conduct may have actually enhanced navigability, though at the devastating cost of the natural land buffer."[61]

In further support of its position, Plaintiff discusses *Louisiana Crawfish Producers Association—West v. Amerada Hess Corp.*, where, according to Plaintiff, a magistrate judge in the Western District of Louisiana determined that failure to maintain oil pipelines and dredged canals did not sufficiently connect to traditional maritime activity.[62]

Second, Plaintiff argues that even if the Petition asserts general maritime claims, "that alone would not suffice to support this Court's exercise of jurisdiction."[63] According to Plaintiff, a plaintiff may bring maritime claims in state court under the "saving-to-suitors" clause of 28 U.S.C. § 1333, and "[t]he traditional rule regarding maritime claims brought in state court is that such claims cannot be removed unless 'there exists some basis for jurisdiction other than admiralty.'"[64]

Plaintiff acknowledges that two decisions from the Southern District of Texas have held that a recent amendment to 28 U.S.C. § 1441 "has undermined the long-standing prohibition on

---

[60] Rec. Doc. 70-1 at p. 12.

[61] *Id.*

[62] *Id.* at p. 12–14 (citing *Louisiana Craw Producers Ass'n v. Amerada Hess Corp.*, No. 10-348, 2012 WL 6929427 (W.D. La. Aug. 1, 2012) (Hanna, M.J.)).

[63] *Id.* at p. 14.

[64] *Id.* (quoting *In re Eckstein Marine Serv., L.L.C.*, 672 F.3d 310, 315–16 (5th Cir. 2012)).

removal."[65] However, Plaintiff maintains that these cases "offer a faulty analysis because they fail to recognize that the saving-to-suitors clause has long provided the basis for the non-removability of maritime claims and they fail to address how the amendment of § 1441 alters the traditional rule."[66] According to Plaintiff, two courts in this District "have continued to adhere to the long-standing rule regarding non-removability of maritime claims, even in the wake of the amendment of § 1441."[67] Further, Plaintiff asserts that "[a]t least two post-amendment decisions of the Fifth Circuit dealing with cases filed pre-amendment support the continued viability of the traditional rule as based upon § 1333."[68]

### 2.    Defendants' Arguments in Opposition to Remand

Defendants argue that "[t]he Court should deny the motion to remand because maritime jurisdiction provides an independent basis for exercising federal jurisdiction."[69] According to Defendants, "to determine whether jurisdiction exists, a court must evaluate, first, whether the alleged 'tort occurred on navigable water' or the alleged 'injury suffered on land was caused by a vessel on navigable water' (the 'location' test), and, second, whether the alleged tort has a connection to maritime activity (the 'connection' test)."[70]

---

[65] *Id.* at p. 15 (citing *Wells v. Abe's Boat Rentals, Inc.*, No. 13-1112, 2013 WL 3110322 (S.D. Tex. June 18, 2013); *Ryan v. Hercules Offshore, Inc.*, No. 12-3510, 2013 WL 1967315 (S.D. Tex. May 13, 2013)).

[66] *Id.* at pp. 15–16.

[67] *Id.* at pp. 16–17 (citing *Duet v. Am. Commercial Lines LLC*, No. 12-3025, 2013 WL 1682988 (E.D. La. Apr. 18, 2013) (Milazzo, J.); *Int'l Transp. Workers Fed. v. Mi-Das Line, SA*, No. 12-2503, 2012 WL 5398470 (E.D. La. Nov. 2, 2012) (Lemelle, J.)).

[68] *Id.* at p. 17 (citing *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 219 (5th Cir. 2013); *In re Eckstein*, 672 F.3d at 310).

[69] Rec. Doc. 260 at p. 30.

[70] *Id.* at p. 31 (quoting *Grubart*, 513 U.S. at 534).

With respect to the location test, Defendants contend that "[t]he 'location' test is satisfied because the Petition alleges injuries suffered on land purportedly caused by vessels on navigable waters."[71] Specifically, Defendants assert that "[t]he Petition rests principally on allegations that Defendants' oil and gas dredging activities created a network of access and pipeline canals that have resulted in a loss of coastal lands."[72]

Looking at the connection test, Defendants represent that "[c]ourts have held that the 'connection' test is met when there is 'a potentially disruptive impact on maritime commerce' and 'the general character of the activity' giving rise to the litigation 'shows a substantial relationship to traditional maritime activity.'"[73] According to Defendants, "[t]he Petition's alleged activities impact maritime commerce." Defendants cite *In re Ingram Barge Co.*[74] for the proposition that dredging activities "by their 'very nature . . . seem[] to affect maritime commerce[.]"[75] Further, Defendants argue that the Petition alleges that Defendants "have contributed to an 'increased storm surge risk,'" which would necessarily affect the Port of New Orleans and traffic on the Mississippi River.[76] Addressing the second part of the connection test, Defendants contend that "[b]oth dredging and oil and gas drilling from barges or other vessels have been deemed by the courts (including the Supreme Court) to constitute traditional maritime activities."[77]

---

[71] *Id.*

[72] *Id.*

[73] *Id.* (quoting *Grubart*, 513 U.S. at 534).

[74] No. 05-4419, 2007 WL 837181 (E.D. La. Mar. 14, 2007) (Berrigan, J.).

[75] Rec. Doc. 260 at pp. 32–33 (alternations in original).

[76] *Id.* at p. 33.

[77] *Id.* (citing, e.g., *Ellis v. United States*, 206 U.S. 246, 259 (1907)).

Following this analysis of whether Plaintiff's claims are properly characterized as maritime claims, Defendants argue that "maritime claims supply an independent basis for removing this action to federal court under 28 U.S.C. § 1441."[78] Defendants acknowledge that § 1441(b) had previously "prevented removal of maritime claims absent an independent basis for jurisdiction,"[79] such as diversity, but maintain that post-amendment "there is no impediment to this Court's removal jurisdiction."[80] Defendants counter Plaintiff's argument that the prohibition on removal is grounded in § 1331's saving-to-suitors clause, asserting that "the 'saving to suitors clause does no more than preserve the right of maritime suitors to pursue nonmaritime *remedies*. It does not guarantee them a nonfederal *forum*, or limit the right of defendants to remove such actions to federal court where there exists some basis for federal jurisdiction other than admiralty.'"[81] Defendants point to three district court cases recognizing that the effect of the amendment to § 1441 "is to render maritime and admiralty cases removable under § 1441(b)"—*Ryan v. Hercules Offshore, Inc.*,[82] *Wells v. Abe's Boat Rental, Inc.*,[83] and *Bridges v. Phillips 66 Co.*[84] Further, Defendants distinguish the cases cited by Plaintiffs, contending that they either do not address whether the amendment changed the traditional rule or involve claims filed prior to the amendment.[85]

---

[78] *Id.* at p. 35.

[79] *Id.*

[80] *Id.*

[81] *Id.* (quoting *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 153 (5th Cir. 1996)).

[82] 2013 WL 1967315.

[83] 2013 WL 3110322.

[84] No. 13-4777 (M.D. La. filed Sept. 27, 2013).

[85] Rec. Doc. 260 at pp. 38–39 (discussing *Barker*, 713 F.3d at 219; *In re Eckstein*, 672 F.3d at 310; *Duet*, 2013 WL 1682988*; Int'l Transp. Workers Fed.*, 2012 WL 5398470).

### 3. Plaintiff's Reply in Further Support of Remand

In its reply, Plaintiff reiterates "[m]aritime commerce is not at issue in this case. The Authority's case is based upon the increased costs that the Authority will be forced to bear in building and maintaining flood protection assets."[86] According to Plaintiff, "[o]nly in the highly attenuated sequence of events proposed by Defendants are those flood protection assets linked to maritime commerce."[87] Further, Plaintiff maintains that "even if there were a sufficient connection with maritime commerce in this case to establish jurisdiction, the Defendants mistakenly rely on *Ryan v. Hercules Offshore, Inc.* as providing the rule that this Court must follow for removability of maritime cases."[88] According to Plaintiff, *Ryan* was wrongly decided, and "the amendment to § 1441 was not meant to effect such a profound change."[89]

### 4. Supplemental Authority

Following oral argument on the pending motion, both Plaintiff and Defendants submitted supplemental authority regarding the removability of admiralty claims. On January 31, 2014, Defendant brought to the Court's attention a district court order in *Tiley v. American Tugs*, wherein the court adopted the reasoning set forth in *Ryan* and denied a motion to remand.[90] On June 3, 2014, however, Defendants informed the Court that the district court had vacated its earlier *Tiley* order.[91] On March 24, 2014, Plaintiff filed a notice of supplemental authority regarding *Coronel v. AK*

---

[86] Rec. Doc. 292 at p. 35.

[87] *Id.*

[88] *Id.* at p. 36.

[89] *Id.* at p. 37.

[90] Rec. Doc. 317 (citing *Tiley v. Am. Tugs, Inc.*, No. 13-6104 (E.D. La. filed Jan. 16, 2014) (Engelhardt, J.)).

[91] Rec. Doc. 360 (citing *Tiley v. Am. Tugs, Inc.*, No. 13-6104 (E.D. La. filed May 16, 2014) (Engelhardt, J.)).

14

*Victory*, a case from the Western District of Washington in which a court determined that it lacked removal jurisdiction over general maritime claims.[92]

## B.    Applicable Law

Article III of the U.S. Constitution extends the judicial power of the United States to "all Cases of admiralty and maritime Jurisdiction."[93] In 28 U.S.C. § 1333, Congress implemented this power, giving federal district courts "original jurisdiction . . . of . . . [a] civil case of admiralty or maritime jurisdiction . . . ."[94]

In determining whether admiralty jurisdiction exists over a tort claim, courts apply the two-part analysis set forth by the Supreme Court in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock*.[95] The first part, known as the location test, asks "whether the tort occurred on navigable water or whether the injury suffered on land was caused by a vessel on navigable water."[96] In this context, "navigable water" refers to a body of water that is "navigable in fact."[97] Bodies of water are navigable in fact where "they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."[98]

---

[92] Rec. Doc. 337 (citing *Coronel v. AK Victory*, No. 13-2304, 2014 WL 820270 (W.D. Wash. Feb. 28, 2014)).

[93] U.S. Const., Art. III, § 2.

[94] 28 U.S.C. § 1333(1).

[95] 513 U.S. 527 (1995).

[96] *Id.* at 534.

[97] *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1870).

[98] *Id.*

The second part, known as the connection test, raises two issues. First, a court must "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce."[99] This inquiry "turns . . . on a description of the incident at an intermediate level of possible generality."[100] Second, a court must examine "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."[101] At this step, the court "ask[s] whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand."[102]

## C.    Analysis

Looking first at the location test, to evaluate whether the tort occurred on navigable water or whether the injury suffered on land was caused by a vessel on navigable water, the Court must determine what the alleged injury is. In this case, the injury at issue is "ecological degradation and extensive land loss" within the Buffer Zone, which "in turn has created markedly increased storm surge risk, attendant flood protection costs, and, thus, damages to Plaintiff."[103] Land degradation and land loss by their very nature occur on land.  Thus, the question becomes whether this injury was caused by a vessel on navigable water. According to the allegations in the Petition, this injury was

---

[99] *Grubart*, 513 U.S. at 534 (internal citations and quotation marks omitted).

[100] *Id.* at 539.

[101] *Id.* at 534 (internal citations and quotation marks omitted).

[102] *Id.* at 539–40.

[103] Rec. Doc. 1-2 at p. 11.

caused by various activities of Defendants, including dredging.[104] The parties do not dispute that dredges are vessels, and as the Supreme Court observed in *Stewart v. Dutra Construction Company*, courts have consistently "group[ed] dredges alongside more traditional seafaring vessels under the maritime statutes."[105] Further, the parties do not dispute that the coastal waterways that were dredged are navigable waters. Accordingly, the Court finds that the location test is met.

Turning to the connection test, to determine whether the incident has a potentially disruptive impact on maritime commerce, the Court must first describe the incident at an intermediate level of possible generality. The description should be "neither too general to distinguish different cases nor too specific to the unique facts of the particular case"[106]—that is, it "should be general enough to capture the possible effects of similar incidents on maritime commerce, but specific enough to exclude irrelevant cases."[107] *Grubart* instructs that the purpose of this exercise is to determine "whether the incident could be seen within a class of incidents that pose[] more than a fanciful risk to commercial shipping."[108] For example, in *Grubart*, the defendant had used a crane, sitting on a barge in the Chicago River to drive piles into the riverbed above a tunnel in order to reinforce a bridge.[109] Months later, the walls and ceiling of the tunnel collapsed, causing the tunnel as well as nearby buildings to flood.[110] The Court characterized the incident as "damage by a vessel in

---

[104] *Id.* at pp. 9–11.

[105] 543 U.S. 481, 497 (2005).

[106] *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, —F.3d—, 2014 WL 2016551, at *7 (2d Cir. May 19, 2014).

[107] *Id.* at *9.

[108] *Grubart*, 513 U.S. at 539.

[109] *Id.* at 529.

[110] *Id.* at 530.

17

navigable water to an underwater structure."[111] In *Sisson v. Ruby*,[112] a case on which *Grubart* relied, a fire erupted on a pleasure yacht docked at a marina on Lake Michigan.[113] The fire destroyed the yacht and damaged several neighboring vessels and the marina.[114] There, the Supreme Court described the incident as "a fire on a vessel docked at a marina on navigable waters."[115] *Grubart* elaborated on *Sisson*'s characterization, explaining "[t]o speak of the incident as 'fire' would have been too general to differentiate cases; at the other extreme, to have described the fire as damaging nothing but pleasure boats and their tie-up facilities would have ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby."[116]

In its Motion to Remand, Plaintiff suggests that this incident focuses on "the degradation of coastal lands . . . through Defendants' oil and gas production activities."[117] This description ignores that the particular "oil and gas production activity" at issue is dredging by vessels in navigable waters. Although Defendants do not propose a precise description to apply to this analysis, in discussing the connection test, they aver that the Petition "focuses on Defendants' dredging activities" and "alleges that Defendants have contributed to an increased storm surge risk."[118] This characterization is misleading as it fails to address the many intermediate steps between the initial

---

[111] *Id.* at 540.

[112] 497 U.S. 358 (1990).

[113] *Id.* at 360.

[114] *Id.*

[115] *Id.* at 362–63.

[116] *Grubart*, 513 F.3d at 538–39.

[117] Rec. Doc. 70-1 at p. 11.

[118] Rec. Doc. 260 at pp. 32–33 (internal quotation marks omitted).

dredging and the presence of an increased storm surge risk. The Court finds that at an intermediate level of generality, the incident here is properly described as coastal erosion caused by dredging in navigable waters.

Having characterized the incident, the Court must evaluate whether the incident has a potentially disruptive impact on maritime commerce—that is, whether the incident could be seen within a class of incidents that pose more than a fanciful risk to commercial shipping. Coastal erosion, by itself, does not interfere with maritime commerce or commercial shipping. It does not impede vessel traffic,[119] threaten the physical integrity of vessels,[120] or result in injury to any person on a vessel.[121] Although coastal erosion has allegedly led to increased flood vulnerability, which in turn will allegedly require more spending on flood protection assets, this result is not disruptive to maritime commerce. Plaintiff is not an entity involved in maritime commerce, and its increased financial burden does not negatively impact maritime commerce. The Court is cognizant that a hurricane and the accompanying flooding could certainly impact the Port of New Orleans and commercial shipping in the region, but the Court cannot rely on such an attenuated series of events to find that the dredging at issue here disrupts maritime commerce.

While the Court concludes that the incident at issue does not have a potentially disruptive impact on maritime commerce, for completeness, the Court addresses the second prong of the

---

[119] *See, e.g.*, *Grubart*, 513 F.3d at 539 (noting that "river traffic ceased, several commuter ferries were stranded, and many barges could not enter the river system because the river level was lowered to aid repair efforts").

[120] *See, e.g.*, *Sisson*, 497 U.S. at 362 (recognizing that a fire "can spread to nearby commercial vessels or make the marina inaccessible to such vessels" and "is one of the most significant hazards facing commercial vessels").

[121] *See, e.g.*, *Gruver v. Leshman Fisheries, Inc.*, 489 F.3d 978, 982–83 (9th Cir. 2007) (finding that an employer's physical assault on a crewman on a fishing vessel had a potentially detrimental effect on maritime commerce by depriving the vessel of a deckhand due to his injuries).

connection test—whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. In *Grubart*, the Court explained that "[t]he substantial relationship test is satisfied where at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident."[122] Further, *Grubart* recognized that "ordinarily" a "tort involving a vessel on navigable waters" will have a substantial relationship to traditional maritime activity.[123] As noted above, the primary activity at issue here involved dredges, which courts recognize as vessels,[124] operating on navigable waters.

The Court finds that coastal erosion caused by dredges in navigable waters does not have a potentially disruptive effect on maritime commerce, and thus the Court does not have admiralty jurisdiction over this matter. Accordingly, the Court need not decide whether general maritime law claims are removable under 28 U.S.C. § 1441 absent a separate and independent ground of federal subject matter jurisdiction.[125]

---

[122] *Grubart*, 513 U.S. at 541.

[123] *Id.* at 543.

[124] *See Stewart*, 543 U.S. at 497.

[125] The Court notes that district courts have sharply divided on this issue.  Some district courts have held that the amendment to § 1441 did not render claims brought under general maritime law removable absent a separate basis for jurisdiction. *See Coronel*, 2014 WL 820270 at *2–11; *Barry v. Shell Oil Co.*, No. 13-6133, 2014 WL 775662, at *1–3 (E.D. La. Feb. 25, 2014) (Zainey, J.). Other courts, however, have held that the amendment to § 1441 changes the traditional rule and makes maritime claims removable. *See Garza v. Phillips 66 Co.*, No. 13–742, 2014 WL 1330547, at *4–5 (M.D. La. Apr. 1, 2014); *Harrold v. Liberty Ins. Underwriters, Inc.*, No. 13–762, 2014 WL 688984, at *3–4 (M.D. La. Feb. 20, 2014); *Carrigan v. M/V AMC AMBASSADOR*, No. 13–03208, 2014 WL 358353, at *2 (S.D. Tex. Jan.31, 2014); *Bridges v. Phillips 66 Co.*, No. 13-477, 2013 WL 6092803, at *4–5 (M.D. La. Nov. 19, 2013); *Wells*, 2013 WL 3110322, at *1–4 ; *Ryan*, 945 F. Supp. 2d at  774–78.

## IV. Whether Federal Enclave Jurisdiction Exists

**A.**     **Parties' Arguments**

   **1.**     **Plaintiff's Arguments in Support of Remand**

Plaintiff contends that "[f]ederal enclave jurisdiction does not attach in this case because [Defendants have] failed to factually demonstrate that there is any federal enclave at issue."[126] Further, Plaintiff maintains that it, "as the master of its own complaint, has not alleged a federal cause of action or made any claim that any federal enclave is relevant to its case."[127] Finally, Plaintiff argues that it "has not alleged that any acts occurred, or injuries were sustained, on a federal enclave."[128]

According to Plaintiff, courts apply a three-prong test to evaluate the existence of a federal enclave sufficient to confer jurisdiction:

> (1) the United States must purchase land from a state for the purpose of erecting forts, magazines, arsenals, dock-yards, or other needful buildings; (2) the state legislature must consent to the jurisdiction of the federal government; and (3) the federal government must accept jurisdiction by "filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated."[129]

With respect to prong one, Plaintiff contends that Defendants have "failed to show how any fort, magazine, arsenal, dock-yard or other needful building erected by the United States was the location of any of the Defendants' acts or omissions, or the injuries suffered by the Authority, as alleged in

---

[126] Rec. Doc. 70-1 at p. 21.

[127] *Id.*

[128] *Id.*

[129] *Id.* at pp. 22–23 (quoting *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *3 (E.D. La. May 16, 2011) (Zainey, J.)).

the Petition."[130] With respect to prong three, Plaintiff asserts that Defendants "offer[] no support for the third prong of the test for federal jurisdiction and without such support, this Court cannot exercise jurisdiction."[131]

Additionally, Plaintiff urges that "this Court should reject [Defendants'] novel interpretation of federal jurisdiction," under which "the mere tangential relation of a federal enclave to a plaintiff's cause of action suffices to confer jurisdiction."[132] According to Plaintiff, "courts have required a close relationship between the federal enclave at issue, the conduct that occurred, and the injury sustained," and have limited federal enclave jurisdiction to cases involving "personal injury and other tort claims that occur on federal enclaves."[133]

### 2.    Defendants' Arguments in Opposition to Remand

In their opposition, Defendants cite a four-prong test for federal enclave jurisdiction:

(1) the United States must have acquired land from a State; (2) the state legislature must have consented to federal jurisdiction; (3) the United States must have formally accepted jurisdiction, but only if the property was acquired by the United States after 1940; and (4) the claims at issue must arise in part on the enclave.[134]

With respect to prong three, Defendants argue that courts have presumed acceptance of jurisdiction for property acquired prior to 1940, and thus that formal acceptance is only required for acquisitions after this time.[135] Although Defendants acknowledge that 40 U.S.C. § 3112, as amended in 2002, now provides that "i[t] is conclusively presumed that jurisdiction has not been accepted

---

[130] *Id.* at p. 23.

[131] *Id.*

[132] *Id.* at p. 24.

[133] *Id.*

[134] Rec. Doc. 260 at p. 39 (citing *Wood*, 2011 WL 1870218, at *2).

[135] *Id.* at p. 40 (citing, *e.g.*, *United States v. Davis*, 726 F.3d 357, 369 (2d Cir. 2013)).

until the Government accepts jurisdiction over land,"[136] Defendants contend that if formal acceptance were required, "dozens of properties would lose their federal enclave status where the federal government has relied on the pre-1940 presumption that it accepted jurisdiction."[137]

Examining the fourth prong, Defendants aver that Plaintiff's "contention that the Court lacks jurisdiction because the Board has not alleged an injury that occurred on a federal enclave is equally flawed."[138] They contend that "[a]rtful pleading does not defeat a federal court's jurisdiction over disputes involving federal enclaves."[139] According to Defendants, "there are at least two federal enclaves within the area of alleged wetland loss—(1) Breton Island and Chandeleur Island in the Breton National Wildlife Refuge ('Breton NWR') and (2) the Delta National Wildlife Refuge ('Delta NWR')."[140] Defendants argue:

> There can be no doubt that the alleged tortious activity and resulting land loss has occurred on these federal enclaves and that the relief sought by the Board, if granted, will require marsh creation, restoration, and related work on the enclaves. Although there is currently a moratorium against drilling in the Breton NWR, oil and gas exploration and development historically occurred there. Dredging also occurred in the Delta NWR.[141]

Further, Defendants argue that Plaintiff's "Petition does not distinguish between the alleged injuries caused to federal enclaves from other alleged injuries."[142]

---

[136] The law was previously codified at 40 U.S.C. § 255.

[137] Rec. Doc. 260 at p. 40.

[138] *Id.*

[139] *Id.* at pp. 40–41 (citing, *e.g.*, *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992)).

[140] *Id.* at p. 41.

[141] *Id.* at p. 42.

[142] *Id.*

### 3.        Plaintiff's Reply in Further Support of Remand

In its reply, Plaintiff avers that "[e]ven assuming that Defendants have satisfied their burden of proving any specific area fulfills the prerequisites for enclave status, they have failed to bear their burden of proving that the federal law applicable within those enclaves creates any of the Authority's causes of action."[143] In support of this position, Plaintiff maintains that "federal enclave jurisdiction is part of a court's federal question jurisdiction under 28 U.S.C. § 1331."[144] Thus, according to Plaintiff, "[w]hether a claim arises under federal jurisdiction must be determined by referring to the 'well-pleaded complaint'" and "a federal question must appear on the face of the complaint."[145]

Additionally, Plaintiff contends that neither the Breton National Wildlife Refuge nor the Delta National Wildlife Refuge "bears any significant relationship to the Authority's claims."[146] Plaintiff asserts that "[i]n fact, neither one even falls within the Buffer Zone."[147]

### 4.        Statements at Oral Argument

At oral argument, Defense counsel stated to the Court that Defendants would withdraw their federal-enclave ground for removal if Plaintiff agreed that neither the Breton National Wildlife Refuge nor the Delta National Wildlife Refuge is in the Buffer Zone. The Court inquired whether Plaintiff would stipulate that the Breton National Wildlife Refuge and the Delta National Wildlife Refuge are not in the Buffer Zone. Counsel for Plaintiff indicated that he was not prepared to make

---

[143] Rec. Doc. 292 at p. 40.

[144] *Id.* at p. 39.

[145] *Id.*

[146] *Id.* at p. 40.

[147] *Id.*

that stipulation without conferring with co-counsel because he had not handled the federal enclave portion of Plaintiff's argument. Accordingly, the Court stated that it would determine the matter.

## B.    Applicable Law

Federal enclave jurisdiction is a form of federal question jurisdiction derived from Article I, section 8, clause 17 of the United States Constitution.[148] That clause gives Congress exclusive legislative jurisdiction over federal enclaves, or "all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings."[149] Courts have reasoned that if Congress has legislative jurisdiction over federal enclaves, then federal courts must also have subject matter jurisdiction over controversies "which arise from incidents occurring in federal enclaves."[150]  In order for a place to be a federal enclave, three conditions must be present:

> (1) the United States must purchase land from a state for the purpose of erecting forts, magazines, arsenals, dock-yards, or other needful buildings, (2) the state legislature must consent to the jurisdiction of the federal government, and (3) if the property was acquired after 1940, the federal government must accept jurisdiction

---

[148] *See Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Mater v. Holley*, 200 F.2d 123, 124–25 (5th Cir. 1952).

[149] U.S. Const. Art. I, § 8, cl. 17.

[150] *Akin*, 156 F.3d at 1034; *see also, e.g.*, *Mater*, 200 F.2d at 124 (observing that the United States has exclusive sovereignty in enclave areas and stating that "[i]t would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate controversies arising there"); *Lawler v. Miratek Corp.*, No. 09-252, 2010 WL 743925, at *2 (W.D. Tex. Mar. 2, 2010) ("In order to determine whether this Court has subject matter jurisdiction over these claims, it must determine whether or not they arose on federal enclaves."); *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1323 (N.D. Ala. 2010) (Davis, M.J.) (finding federal enclave jurisdiction where "there is evidence in the record that [Plaintiff] was exposed to asbestos while working on ships located at these [federal] shipyards"); *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 713 (E.D. Tex. 1998) (noting that federal enclave jurisdiction would apply where Plaintiff was exposed to leukemia-inducing agents at a facility from 1944–79 and the federal government owned the facility from 1944–55); *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) (finding federal enclave jurisdiction where plaintiff was exposed to asbestos at a Navy shipyard).

by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated.[151]

## C.    Analysis

Defendants initially maintained that federal enclave jurisdiction exists in this case because "there are at least two federal enclaves within the area of alleged wetland loss—(1) Breton Island and Chandeleur Island in the Breton National Wildlife Refuge ('Breton NWR') and (2) the Delta National Wildlife Refuge ('Delta NWR')."[152] At oral argument, however, Defense counsel indicated that Defendants would withdraw their federal enclave argument if Plaintiff stipulated that the Breton National Wildlife Refuge and the Delta National Wildlife Refuge were not in the Buffer Zone. Although counsel for Plaintiff, noting that he had not worked on the portion of the motion addressing federal enclave jurisdiction, was unwilling to make that stipulation at oral argument, a review of the record indicates that in its reply brief, Plaintiff states that "neither one even falls within the Buffer Zone."[153] Accordingly, the Court finds that Breton National Wildlife Refuge and the Delta National Wildlife Refuge are not in the Buffer Zone.

Aside from the Breton National Wildlife Refuge and the Delta National Wildlife Refuge, Defendants do not point to any other possible federal enclaves within the Buffer Zone, the area identified in the Petition as experiencing coastal erosion. Further, Defendants do not direct the Court to any possible federal enclaves where Defendants conducted the dredging or other activities that allegedly caused the coastal erosion. Although Defendants mention that there are "numerous

---

[151] *Wood*, 2011 WL 1870218, at *2 (citing *Paul v. United States*, 371 U.S. 245, 264 (1963); *Dekalb Cnty., Ga. v. Henry C. Beck Co.*, 382 F.2d 992, 994–95 (5th Cir. 1967)) (internal citations and quotation marks omitted).

[152] Rec. Doc. 260 at p. 41.

[153] *Id.*

[] federal enclaves in the New Orleans area,"[154] they do not demonstrate how this controversy arises from an incident at any of those alleged enclaves. Unless Defendants' conduct took place on a federal enclave or the damage complained of—coastal erosion—occurred on a federal enclave, the Court cannot say that the controversy arises from an enclave. While certain federal structures in the New Orleans area might face increased flood risks due to Defendants' alleged conduct, this relationship is too attenuated to support the conclusion that federal enclave jurisdiction is proper.

Considering that the parties agree that Breton National Wildlife Refuge and the Delta National Wildlife Refuge are outside the Buffer Zone, and that Defendants have not identified any other possible federal enclaves in the area where Defendants' conduct took place or in the area experiencing erosion, it is unnecessary to apply the three-part test for whether a federal enclave truly exists.

## V. Whether the Outer Continental Shelf Lands Act ("OCSLA") Provides Jurisdiction

### A.    Parties' Arguments

#### 1.    Plaintiff's Arguments in Support of Remand

Plaintiff asserts that "[b]ecause none of the acts and omissions that form the basis for the Authority's claims involves [sic] an operation on the outer continental shelf, OCSLA cannot provide a basis for jurisdiction in this matter."[155] Citing the Fifth Circuit's decision in *Amoco Production Co. v. Sea Robin Pipeline Co.*,[156] Plaintiff explains that "OCSLA 'confers upon the federal district courts jurisdiction to hear and determine certain disputes which Congress anticipated that oil and gas leases on the OCS [outer continental shelf] and operations thereunder might

---

[154] Rec. Doc. 260 at p. 41.

[155] Rec. Doc. 70-1 at p. 20.

[156] 844 F.2d 1202 (5th Cir. 1988).

27

generate.'"[157] According to Plaintiff, OCSLA's jurisdictional grant "is limited to 'activity occurring beyond the territorial waters of the states.'"[158] Plaintiff points to *Demette v. Falcon Drilling Co.*[159] as establishing a three-part test for "whether a cause arises under OCSLA."[160] That test examines whether: "(1) the facts underlying the complaint occurred on the outer continental shelf; (2) the acts were in furtherance of mineral development on the outer continental shelf; and (3) the injury would have occurred but for the actions on the outer continental shelf."[161]

Averring that "the acts and omissions at issue center on Louisiana's coastal *lands*, rather than waters,"[162] Plaintiff argues that OCSLA cannot serve as grounds for removal where:

> (1) none of the acts or omissions at issue occurred on the outer continental shelf; (2) no injury was sustained away [sic] on the outer continental shelf; (3) and the only connection to the outer continental shelf is that there is an attenuated commercial relationship between the acts and omissions complained of and activity that occurs on the outer continental shelf.[163]

## 2.    Defendants' Arguments in Opposition to Remand

In opposition to Plaintiff's "Motion to Remand," Defendants argue that "[b]ecause this case involves pipelines that transport hydrocarbons from the outer continental shelf, the Court has federal question jurisdiction under OCSLA."[164] Citing *Sea Robin Pipeline Co.*, Defendants contend that

---

[157] Rec. Doc. 70-1 at p. 20 (quoting *Sea Robin*, 844 F.2d at 1206).

[158] *Id.* (quoting *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013)).

[159] 280 F.3d 492 (5th Cir. 2002), *overruled in part by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).

[160] Rec. Doc. 70-1 at p. 21.

[161] *Id.* (citing *Demette*, 280 F.3d at 496).

[162] *Id.* (emphasis in original).

[163] *Id.*

[164] Rec. Doc. 260 at p. 26.

"OCSLA jurisdiction exists with respect to any dispute that threatens to disrupt mineral production on the outer continental shelf."[165] Further, Defendants maintain that "the Fifth Circuit has held that OCSLA's grant of federal jurisdiction should be interpreted and applied very broadly."[166]

According to Defendants, this case comes within OCSLA's broad grant of jurisdiction as Plaintiff's "claims present a direct threat to the efficient exploitation of minerals in the outer continental shelf."[167] Defendants aver that Plaintiff's requested relief—backfilling and revegetating every canal dredged by Defendants—"would dramatically alter oil and gas production-related operations in the region, including exploration, development, and production operations on the outer continental shelf."[168] Further, Defendants assert that the dredged canals at issue in this case "are used not only to transport hydrocarbons produced through operations occurring within three miles of the Louisiana coast, but have also been used to transport hydrocarbons from the outer continental shelf to onshore terminals and other locations since the late 1940s."[169]

Addressing Plaintiff's argument that OCSLA jurisdiction cannot exist because the "acts and omissions at issue center on Louisiana's coastal *lands*, rather than water,"[170] Defendants counter that "the law is well-settled that OCSLA jurisdiction exists 'even where' the acts or omissions giving rise to the suit 'occur on land.'"[171] According to Defendants, "[t]o give effect to § 1349's broad grant

---

[165] *Id.* (citing *Amoco Production*, 844 F.2d at 1210).

[166] *Id.* at p. 27 (citing, *e.g.*, *Barker*, 713 F.3d at 221).

[167] *Id.*

[168] *Id.* at p. 28.

[169] *Id.*

[170] *Id.* at p. 29 (citing Rec. Doc. 70-1 at p. 26) (emphasis in original).

[171] *Id.* (quoting *BP Exploration & Prod., Inc. v. Callidus Tech., L.L.C.*, No. 02-2318, 2003 WL 193450, at *4 (E.D. La. Jan. 27, 2003) (Zainey, J.)).

29

of jurisdiction, courts thus do not look soley to whether the operation occurred in the water, but instead find OCSLA applicable whenever the liberal 'but for' test for federal-question jurisdiction is met."[172] Defendants point to three reasons why this case meets the but-for test. First, Defendants contend that "the alleged facts implicate the 'proper situs' because Defendants include producers that transport resources from the outer continental shelf to on-shore terminals by way of pipelines located in the canals that are the subject of the Board's claims."[173] Next, Defendants assert that the challenged conduct—dredging canals in wetlands—"was performed in furtherance of mineral development on the outer continental shelf."[174] Finally, Defendants argue that but-for Defendants' mineral operations on the OCS, "there would have been no need to build (nor ongoing use for) some or all of the pipelines that traverse the canals and wetlands at issue."[175]

### 3.   Plaintiff's Reply in Further Support of Remand

In its Reply, Plaintiff asserts that "[t]he test for OCSLA jurisdiction 'is whether the case: (1) involves an operation on the Outer Continental Shelf that involves doing some physical act in search of minerals on the OCS, preparing to extract them by drilling wells and constructing platforms, and removing minerals and transferring them to shore; and, (2) involves a dispute that arises out of or in connection with the defendant's operation on the OCS, that is, 'but for' the operation on the OCS would the case or controversy have arisen.'"[176] According to Plaintiff, neither prong of this test is

---

[172] *Id.*

[173] *Id.*

[174] *Id.* at p. 30.

[175] *Id.*

[176] Rec. Doc. 292 at pp. 37–38 (quoting *Stevens v. Energy XXI GOM, LLC*, No. 11-154, 2011 WL 2489998, at *3 (M.D. La. May, 18, 2011) (Riedlinger, M.J.)) (internal alterations omitted).

met. First, Plaintiff avers that the claims "concern[] activity in the coastal Buffer Zone" and "[t]hat geographic description conclusively precludes outer continental shelf operations."[177] Further, Plaintiff maintains that the but-for test is not met: "The Authority would have a case regardless of whether certain pipelines that run through the Buffer Zone connect to the outer continental shelf operations, because the Authority's case is factually dependent upon the exploration and production activities that Defendants undertook *within the Buffer Zone*."[178]

Finally, Plaintiff argues that Defendants misinterpret Plaintiff's requested relief, stating that "[n]owhere does the Authority suggest that it seeks to have operational pipelines shut off and removed."[179] Thus, relief in this case would not disrupt operations on the OCS.[180]

### 4.     Supplemental Authority

On March 5, 2014—after the Court heard oral argument on the pending motion—Defendants filed a "Notice of Supplemental Authority," bringing the Fifth Circuit's February 24, 2014 decision in *In re Deepwater Horizon*[181] to the Court's attention.[182] According to Defendants, *Deepwater Horizon* "rejected the [] contention that OCSLA contains a 'situs requirement,' which would limit its reach to injuries occurring on the outer continental shelf itself."[183] Defendants aver that

---

[177] *Id.* at p. 38.

[178] *Id.* (emphasis in original).

[179] *Id.* at p. 39.

[180] *Id.*

[181] 745 F.3d 157 (5th Cir. 2014).

[182] Rec. Doc. 334 at p. 1.

[183] *Id.* at p. 2.

"*Deepwater Horizon* confirms that OCSLA jurisdiction is proper,"[184] noting "[a]lthough it is true that neither the dredging nor the erosion took place on the OCS, *Deepwater Horizon* holds that OCSLA contains no 'situs' requirement."[185]

## B.     Applicable Law

Pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), as codified at 43 U.S.C. § 1349(b)(1), the district courts of the United States have jurisdiction over claims "arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf . . . ."[186] This jurisdictional grant is broad,[187] and "[a] plaintiff does not need to expressly invoke OCSLA in order for it to apply."[188]

As the Fifth Circuit recently explained in *Deepwater Horizon*, "[c]ourts typically assess jurisdiction under this provision in terms of whether (1) the activities that caused the injury constituted an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals, and (2) the case 'arises out of, or in connection with' the operation."[189] With respect to the first prong of this analysis, although OCSLA itself does not define "operation,"

---

[184] *Id.*

[185] *Id.*

[186] 43 U.S.C. § 1349(b)(1).

[187] *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163 (OCSLA's jurisdictional grant is "straightforward and broad"); *Barker*, 713 F.3d at 213 ("The jurisdictional grant in OCSLA is broad, covering a 'wide range of activities occurring beyond the territorial waters of the states.'"); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 154 (5th Cir. 1996) ("The jurisdictional grant, contained in 43 U.S.C. § 1349(b)(1), is very broad.").

[188] *Barker*, 713 F.3d at 213.

[189] *Deepwater Horizon*, 745 F.3d at 163.

the Fifth Circuit has stated that operation is "the doing of some physical act."[190] "Exploration,

development, or production" respectively refer to "the processes involved in searching for minerals

on the OCS; preparing to extract them by, inter alia, drilling wells and constructing platforms; and

removing the minerals and transferring them to shore."[191] The second prong of the jurisdictional test

"require[s] only a 'but for' connection"—that is, a court must evaluate whether but for the operation

would the case have arisen.[192] *Deepwater Horizon* clarified that there is no situs requirement for

jurisdiction under OCSLA, explaining "[b]ecause federal jurisdiction exists for cases 'arising out

of, or in connection with' OCS operations, 43 U.S.C. § 1349, the statute precludes an artificial limit

based on situs."[193] Indeed, the Fifth Circuit noted in *Deepwater Horizon* that a situs requirement

"conflicts with this court's but-for test."[194]

In its "Motion to Remand," Plaintiff cites the test set forth by the Fifth Circuit in *Demette*

*v. Falcon Drilling Co.* for whether a cause of action arises under OCSLA.[195] According to Plaintiff,

the *Demette* test asks whether "(1) the facts underlying the complaint occurred on the outer

continental shelf; (2) the acts were in furtherance of mineral development on the outer continental

shelf; and (3) the injury would have occurred but for the actions on the outer continental shelf."[196]

Plaintiff argues that because "none of these elements are met . . . the Authority's claims do not arise

---

[190] *Tenn. Gas Pipeline*, 87 F.3d at 154 (internal quotation marks and citations omitted).

[191] *Id.* at 154–55 (citing 43 U.S.C. § 1331(k)–(m)).

[192] *Deepwater Horizon*, 745 F.3d at 163.

[193] *Id.* at 164.

[194] *Id.*

[195] Rec. Doc. 70-1 at p. 21 (citing *Demette*, 280 F.3d at 496).

[196] *Id.* (citing *Demette*, 280 F.3d at 496).

under OCSLA and OCSLA cannot provide a basis for removal."[197] However, the *Demette* test cited by Plaintiff is not a test for whether the Court has jurisdiction pursuant to 43 U.S.C. § 1349, as claimed by Plaintiff. Rather, *Demette* addresses choice of law issues under 43 U.S.C. § 1333, another provision of OCSLA. In *Deepwater Horizon*, the Fifth Circuit explicitly cautioned against "intertwin[ing] the Section 1349 jurisdictional inquiry with OCSLA's choice of law provision, 43 U.S.C. § 1333, . . . because the provisions and issues they raise are distinct."[198] Accordingly, the Court declines to adopt the Plaintiff's articulation of the test for whether jurisdiction exists under OCSLA.

## C.    Analysis

### 1.    Whether the Activities that Caused the Injury Constituted an Operation Conducted on the Outer Continental Shelf that Involved the Exploration and Production of Minerals

Applying the two-prong test described in *Deepwater Horizon*, the Court first examines whether "the activities that caused the injury constituted an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals."[199] Thus, a threshold question is what are the activities that caused the injury. In its petition, Plaintiff alleges that "[i]n the Buffer Zone, Defendants identified in Exhibit A[200] have dredged, used, and/or bear responsibility for the network of access canals and pipelines throughout 20-plus inland oil and gas fields."[201]

---

[197] *Id.*

[198] *Deepwater Horizon*, 745 F.3d at 164.

[199] *Id.* at 163.

[200] "Exhibit A" lists all of the named Defendants in this action. *See* Rec. Doc. 1-2 at pp. 4, 25–34.

[201] *Id.* at p. 11.

Plaintiff also claims that Defendants have "fail[ed] to maintain the canal network."[202] Further, Plaintiff identifies ten other "ongoing oil and gas activities contributing to land loss": road dumps, ring levees, drilling activities, fluid withdrawal, seismic surveys, marsh buggies, spoil disposal/dispersal, watercraft navigation, impoundments, and propwashing/maintenance dredging.[203]

The next question the Court must address is whether these activities constitute an operation conducted on the OCS. As noted above, an operation is defined as "some physical act." All of the acts  alleged in Plaintiff's Petition take place within the Buffer Zone.[204] Indeed, in their Notice of Supplemental Authority, Defendants specifically acknowledge "neither the dredging nor the erosion took place on the OCS."[205] Considering that all of the activities causing Plaintiffs' injuries occurred on Louisiana's coastal lands or within Louisiana's territorial waters, they cannot be characterized as "an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals."[206]

Nevertheless, the Defendants argue "the law is well-settled that OCSLA jurisdiction exists 'even where' the acts of omissions giving rise to the suit 'occur on land.'"[207] This contention inappropriately relies on a district court's order in *BP Exploration & Production, Inc. v. Callidus Technologies, L.L.C.  BP Exploration & Production* did not address jurisdiction under 43 U.S.C.

---

[202] *Id.*

[203] *Id.* at p. 10.

[204] *See, e.g.*, *id.* at p. 11 (alleging that Defendants have dredged "[i]n the Buffer Zone"); *id.* at p. 10 (noting that "the removal of fluid from beneath the coastal lands is causing subsidence of those lands").

[205] Rec. Doc. 334 at p. 2.

[206] *Deepwater Horizon*, 745 F.3d at 163.

[207] Rec. Doc. 260 at p. 29 (quoting *BP Exploration*, 2003 WL 193450, at *4).

§ 1349; rather, it dealt with choice of law under § 1333.[208] As noted above, the Fifth Circuit has directed courts not to intertwine the § 1333 and § 1349 analyses.[209]

Defendants also assert that "[t]o give effect to § 1349's broad grant of jurisdiction, courts thus do not look solely to whether the operation occurred in the water, but instead find OCSLA applicable whenever the liberal 'but for' test for federal-question jurisdiction is met."[210] This argument, however, conflates the two prongs of the test for jurisdiction under OCSLA. Although the second prong involves a but-for analysis, the first prong presents a distinct inquiry—whether "the activities that caused the injury constituted an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals."[211] Here, the first prong—correctly stated—is not met as all of the activities allegedly causing Plaintiff's injuries occurred on Louisiana's coastal lands or within Louisiana's territorial waters.

Finally, Defendants' argument that Plaintiff's claims "present a direct threat to the efficient exploitation of minerals in the outer continental shelf" is unavailing.[212] In this case, Defendants' acts occurred on Louisiana's coastal lands or in Louisiana's coastal waters, and Plaintiff's injuries occurred on Louisiana's coastal lands or in Louisiana's coastal waters. Although some of the dredging and pipelines may have facilitated oil and gas activities on the OCS, Defendants have not identified—nor has the Court located—any case where a court based jurisdiction on such an attenuated relationship between operations on the OCS and the conduct and injuries at issue in the

---

[208] *BP Exploration*, 2003 WL 193450 at *1 (noting that the pending motion requested summary judgment on the issue of choice of law).

[209] *See Deepwater Horizon*, 745 F.3d at 164.

[210] Rec. Doc. 260 at p. 29.

[211] *Deepwater Horizon*, 745 F.3d at 163.

[212] Rec. Doc. 260 at p. 27.

36

litigation. Defendants cite *Amoco Production Co. v. Sea Robin Pipeline Co.*, for the proposition that "Congress intended that 'any dispute that alters the progress of production activities on the [outer continental shelf]' would fall 'within the grant of federal jurisdiction contained in § 1349.'"[213] *Sea Robin*, however, involved take-or-pay contracts for natural gas produced from wells that were located on the OCS, leading the Fifth Circuit to conclude that "[e]xercise of take-or pay rights . . . necessarily and physically has an immediate bearing on the production of the particular well, certainly in the sense of the volume of gas actually produced."[214] Additionally, Defendants characterize *EP Operating Limited Partnership v. Placid Oil Co.*[215] as "finding OCSLA-based jurisdiction where resolution 'would affect the efficient exploitation of resources from the' outer continental shelf." *EP Operating* is also readily distinguishable from this matter as it concerned the partition of offshore equipment attached to the OCS.[216]

## 2.     Whether the Case Arises Out Of, or In Connection With the Operation

Although this matter fails to satisfy prong one of the test for jurisdiction under OCSLA—the activities that caused the injury do not constitute an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals—the Court turns to prong two for completeness. Prong two requires the Court to ask whether "the case 'arises out of, or in connection

---

[213] *Id.* (quoting *Sea Robin*, 844 F.2d at 1210) (emphasis omitted).

[214] *Sea Robin*, 844 F.2d at 1210.

[215] 26 F.3d 563 (5th Cir. 1994).

[216] *See id.* at 565 ("EP Operating Limited Partnership ('EP'), a co-owner of certain property located on the Outer Continental Shelf ('OCS'), filed suit against its co-owners to partition the property.").

with' the operation" on the OCS.[217] In addressing prong two, the Court examines whether the injury would have occurred but for operations on the OCS.[218]

In this case, some of the dredging and pipelines at issue facilitate oil and gas production on the OCS. However, as Plaintiff notes, "the Authority's case is factually dependent upon the exploration and production activities that Defendants undertook *within the Buffer Zone*,"[219] and Exhibit D of Plaintiff's petition identifies hundreds of wells on Louisiana's coastal lands and within Louisiana's coastal waters.[220] Accordingly, the Court finds that Plaintiff's injury would have occurred regardless of operations on the OCS, and the but-for test is not satisfied.

## VI. Whether the Class Action Fairness Act ("CAFA") Provides Jurisdiction

As a preliminary matter, the Court notes that on February 20, 2014, Defendants Chevron U.S.A., Inc., Union Oil Company of California, Chevron Pipeline Co., and Kewanee Industries, Inc. filed a "Notice of Issuance of Supreme Court Judgment."[221] In their Notice, these four defendants represented that they were withdrawing their argument that CAFA supplies a basis for jurisdiction in light of the Supreme Court's opinion in *Mississippi ex. rel Hood v. AU Optronics, Inc.*[222]

---

[217] *Deepwater Horizon*, 745 F.3d at 163.

[218] *See, e.g.*, *id.* (characterizing prong two as "requir[ing] only a 'but-for' connection"); *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350 (determining that "[b]ut for Hufnagel's work on the platform, his injury would not have occurred"); *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988) (finding jurisdiction under OCSLA where the injured worker's employment furthered mineral development on the OCS and "but for" that employment the worker would not have been injured).

[219] Rec. Doc. 292 at p. 38 (emphasis in original).

[220] Rec. Doc. 1-2 at pp. 37–102.

[221] Rec. Doc. 331.

[222] 134 S. Ct. 736 (2014).

38

Considering that only four of the ninety-two remaining defendants indicated that they were withdrawing their CAFA argument, the Court addresses this issue on the merits.

## A. Parties' Arguments

### 1. Plaintiff's Arguments in Support of Remand

Plaintiff asserts that this case is not removable under CAFA because it does not meet the definition of a "mass action." According to Plaintiff, 28 U.S.C. § 1332(D)(11)(B)(i) defines a "mass action" as "a civil action 'in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact.'"[223] Looking to subsection 1332(D)(11)(B)(ii)(III), Plaintiff further argues that the term "mass action" does not include a civil action in which "all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claims or members of a purported class) pursuant to a State statute specifically authorizing such action."[224] Plaintiff points out that "[t]he Authority is the only Plaintiff in this case" and asserts that "[t]his is a case in which all of the claims are asserted by a single public body pursuant to a state statute that specifically authorizes that body to sue."[225]

### 2. Defendants' Arguments in Opposition to Remand

In opposition to Plaintiff, Defendants argue that although the Authority is the only Plaintiff in this case, "'numerosity' is not determined by counting names in a case caption."[226] Instead a court

---

[223] Rec. Doc. 70-1 at p. 18.

[224] *Id.*

[225] *Id.*

[226] Rec. Doc. 260 at p. 43.

39

must examine the substance of an action "so as to determine who are the real parties in interest."[227] Citing the Fifth Circuit's decision in *Mississippi ex rel. Hood v. AU Optronics Corp.*,[228] Defendants contend that "[i]n the context of CAFA, the Fifth Circuit has instructed courts to 'pierce the pleadings and look at the real nature' of the claims 'so as to prevent jurisdictional gamesmanship.'"[229] Defendants look to the Fifth Circuit's decision in *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*,[230] which defined real parties in interest as those "directly and personally concerned in the outcome  of the litigation,"[231] and  reason that the real party in interest is not the Authority, but the residents, business, and properties within the flood protection system.[232]

### 3.    Plaintiff's Reply in Further Support of Remand

In its Reply, Plaintiff argues that "[t]he specific claims at issue in the lawsuit are for harms visited upon the Authority."[233] According to Plaintiff, "the Authority's flood protection system, while protecting the public, is an asset under the Authority's care, and for the protection of which the Authority is the real party in interest."[234]

---

[227] *Id.*

[228] 701 F.3d 796 (5th Cir. 2012), *rev'd Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736 (2014).

[229] Rec. Doc. 260 at p. 43 (quoting *Hood*, 701 F.3d at 799).

[230] 536 F.3d 418 (5th Cir. 2008).

[231] Rec. Doc. 260 at p. 44 (quoting *Caldwell*, 536 F.3d at 428).

[232] *Id.* at p. 44.

[233] Rec. Doc. 292 at p. 43.

[234] *Id.*

**4.      Defendants' Notice of Supreme Court Judgment**

As previously indicated, on February 20, 2014, Defendants Chevron U.S.A., Inc., Union Oil Company of California, Chevron Pipeline Co., and Kewanee Industries, Inc. filed a "Notice of Issuance of Supreme Court Judgment."[235] In their Notice, these four defendants represent that they are withdrawing their argument that CAFA supplies a basis for jurisdiction in light of the Supreme Court's opinion in *Mississippi ex. rel Hood v. AU Optronics, Inc.*[236]

**B.      Applicable Law**

The Class Action Fairness Act of 2005 ("CAFA") "creates original jurisdiction over cases that previously were beyond federal diversity subject-matter jurisdiction" by enabling defendants in civil suits to remove "mass actions" from state to federal court.[237] CAFA defines a "mass action" as a civil action "in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact."[238]

In its 2008 decision in *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, the Fifth Circuit held that "persons" in the mass action context are "the real parties in interest as to the respective claims."[239] The Fifth Circuit reiterated this position in *Mississippi ex. rel Hood v. AU Optronics, Inc.*, a 2012 decision.[240] In *Hood*, the state of Mississippi brought a consumer protection suit against liquid-crystal display ("LCD") manufacturers, alleging that the manufacturers had formed a cartel

---

[235] Rec. Doc. 331.

[236] 134 S. Ct. 736 (2014).

[237] 14B Charles Alan Wright, et al., *Federal Practice and Procedure* § 3724 (4th ed. 2013).

[238] 28 U.S.C. § 1332(d)(11)(B)(i).

[239] *Hood*, 701 F.3d at 800 (explaining *Caldwell*'s holding).

[240] *Id.*

41

to restrict competition and raise prices.[241] The Fifth Circuit reasoned that "the real parties in interest in this suit include both the State and the individual consumers of LCD products" and noted that "it is undisputed that there are more than 100 consumers."[242] Accordingly, the court held that "there are more than 100 claims at issue in this case," and that "[t]he suit therefore meets the CAFA definition of a 'mass action.'"

Mississippi appealed the Fifth Circuit's decision, and on January 14, 2014—after oral argument had been held on the pending "Motion to Remand"—the Supreme Court reversed.[243] In its decision, the Supreme Court rejected the argument that CAFA's numerosity requirement could be satisfied by looking at the real parties in interest:

> The question presented is whether a suit filed by a State as the sole plaintiff constitutes a "mass action" under CAFA where it includes a claim for restitution based on injuries suffered by the State's citizens. We hold that it does not. According to CAFA's plain text, a "mass action" must involve monetary claims brought by 100 or more persons who propose to try those claims jointly as named plaintiffs.[244]

Observing that "the State of Mississippi is the only named plaintiff in the instant action," the Court determined that "the case must be remanded to state court."[245]

## C.    Analysis

In light of the Supreme Court's recent decision in *Hood*, the Court must conclude that the above-captioned matter is not removable pursuant to CAFA. The Authority is the only named plaintiff on the complaint, and *Hood* now forecloses the "real party in interest" analysis previously

---

[241] *Id.*

[242] *Id.* at 802.

[243] 134 S. Ct. at 739.

[244] *Id.*

[245] *Id.*

adopted by the Fifth Circuit in *Caldwell*. Accordingly, the Court finds that the pending case does not meet the definition of a "mass action," and thus the Court does not have jurisdiction pursuant to CAFA.

## VII. Whether Federal Question Jurisdiction Applies

### A.    Parties' Arguments

#### 1.    Plaintiff's Arguments in Support of Remand

Quoting 28 U.S.C. § 1331, Plaintiff asserts that the Court may exercise "original jurisdiction of all civil actions arising under the Constitution, laws or treatises of the United States."[246] According to Plaintiff, "[a] case can 'arise under' federal law in two ways."[247] First, Plaintiff avers, "a case arises under federal law when federal law creates the cause of action asserted."[248] Second, Plaintiff contends, "the Supreme Court has 'identified a 'special and small' category of cases in which arising under jurisdiction still lies' even when the 'claim finds its origins in state rather than federal law.'"[249] Plaintiff argues that neither category applies here.

According to Plaintiff, "federal law does not create any of the Authority's claims."[250] Plaintiff maintains that because "[a] plaintiff is the master of its complaint," it "may assert state-law claims exclusively, even though it may have federal law claims under the same facts."[251] Plaintiff points to the "well-pleaded complaint rule," "which provides that federal jurisdiction exists only

---

[246] Rec. Doc. 70-1 at p. 5 (quoting 28 U.S.C. § 1331) (internal quotation marks omitted).

[247] *Id.*

[248] *Id.* (quoting *Gunn*, 133 S. Ct. at 1064).

[249] *Id.* (quoting *Gunn*, 133 S. Ct. at 1064).

[250] *Id.*

[251] *Id.* (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)).

when a federal question appears on the face of the plaintiff's complaint."[252] Plaintiff argues that it "has exclusively asserted state law claims."[253] While Plaintiff acknowledges that its Petition references federal statutes and permits, it contends that "none of those statutes or permits supplies the Authority with a federal private right of action."[254] Thus, the Court does not have jurisdiction.[255]

Next, Plaintiff argues that its claims "do not raise a substantial question of federal law."[256] Quoting the Supreme Court's 2013 opinion in *Gunn v. Minton*, Plaintiff asserts that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."[257] Although Plaintiff's Petition references federal statutes and regulations, Plaintiff maintains "[w]hether or not Defendants acted (or omitted to act) in accordance with the requirements of those statutes and permits is a factual determination, not a legal one. If the disputed federal issue is one of *fact* rather than *law*, federal court jurisdiction will not attach."[258] According to Plaintiff, "[c]ourts have repeatedly recognized that state-law claims, such as those the Authority asserts in its Petition, that rest in part on the defendant's violation of a federal law do not provide a basis for federal jurisdiction."[259] Further, Plaintiff contends that whether a federal issue

---

[252] *Id.* at p. 6 (citing *Caterpillar*, 482 U.S. at 392).

[253] *Id.*

[254] *Id.*

[255] *Id.* (citing *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 817 (1986)).

[256] *Id.*

[257] *Id.* at p. 7 (quoting *Gunn*, 133 S. Ct. at 1065) (internal quotation marks omitted).

[258] *Id.* (citing *Singh v. Duane Morris, LLP*, 538 F.3d 334, 339 (5th Cir. 2008)) (emphasis in original).

[259] *Id.* at p. 8 (citing, *e.g.*, *Moore v. Chesapeake & Ohio Ry. Co.*, 291 U.S. 205 (1934)).

44

is substantial "looks . . . to the importance of the issue to the federal system as a whole."[260] Plaintiff contends that the Supreme Court has found a federal issue to be substantial in only two instances. In the 1921 case *Smith v. Kansas City Title & Trust Co.*,[261] the federal question was substantial "because the issue was whether federal bonds were issued unconstitutionally, and hence of no validity."[262] Second, in the 2005 case *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,[263] "the federal issue was the power and reach of the IRS in its collection of delinquent taxes."[264] Plaintiff argues that in this case, "whether or not Defendants complied with the requirements of the Clean Water Act or River and Harbors Act does not rise to a similar level of significance as the federal issues in *Grable* and *Smith* because it does not require this Court to examine any issues of constitutionality or determine the reach and power of a federal agency."[265]

### 2.    Defendants' Arguments in Opposition to Remand

Defendants contend that removal is proper "because (1) the Petition seeks to litigate claims that are created by federal law, and (2) the alleged state law claims cannot be adjudicated without resolving a substantial question of federal law."[266]

---

[260] *Id.* (quoting *Gunn*, 133 S. Ct. at 1066).

[261] 255 U.S. 180 (1921).

[262] Rec. Doc. 70-1 at p. 9.

[263] 545 U.S. 308 (2005).

[264] Rec. Doc. 70-1 at p. 9.

[265] *Id.*

[266] Rec. Doc. 260 at p. 13.

Relying on the Supreme Court's 2012 decision in *Mims v. Arrow Financial Services, LLC*,[267] Defendants maintain that "when 'federal law creates the right of action and provides the rules of decision,' a plaintiff's claim 'arises under the laws of the United States.'"[268] Defendants assert that in its Petition, Plaintiff "alleges that it is entitled to enforce the 'obligations and duties'" provided by over 100 federal permits as a third-party beneficiary.[269] Defendants conclude, "[i]t is thus clear that, because of the federal permits at issue, federal law 'creates the right of action' the Board seeks to assert and 'provides the rules of decision' governing the claim."[270]

Defendants also argue that under *Grable*, "federal courts have authority to 'hear claims recognized under state law' when (1) resolving a federal issue is necessary to resolve a state-law claim, (2) the federal issue is actually disputed, (3) the federal issue is substantial, and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities."[271] According to Defendants, all four parts of the *Grable* test are satisfied here.

First, Defendants contend that "[w]hen a court must interpret federal law to determine a plaintiff's claim, a federal issue is necessarily raised."[272] Defendants maintain that Plaintiff's negligence, natural servitude of drain, public nuisance, private nuisance, and third-party beneficiary claims all expressly reference a federal regulatory framework, which includes the River and Harbors

---

[267] 132 S. Ct. 740 (2012).

[268] Rec. Doc. 260 at p. 14 (quoting *Mims*, 132 S. Ct. at 748) (internal citations omitted)) (alterations omitted).

[269] *Id.*

[270] *Id.* (quoting *Mims*, 132 S. Ct. at 748).

[271] *Id.* at p. 15 (quoting *Grable*, 545 U.S. at 314).

[272] *Id.* at p. 16.

46

Act, the Clean Water Act, and the Coastal Zone Management Act.[273] Looking at Plaintiff's tort claims, Defendants aver that Plaintiff "relies on alleged violations of federal statutes, regulations, and permits comprising the applicable 'regulatory framework' as establishing the 'standard of care' giving rise to its claims."[274] Defendants further represent that "[s]ignificantly, the Board has not identified any independent obligation or duty owed by Defendants under state law that could give rise to the alleged 'obligations and duties' on which its claims rest."[275] With respect to Plaintiff's contract claim, Defendants assert that "[t]hrough that claim, the Board seeks to enforce obligations and requirements allegedly imposed by federal law and federal permits. Because the Board has no contractual privity with Defendants, and is not a party to the federal permits, it relies on conclusory allegations that it is a third-party beneficiary to the federal permits."[276] Citing courts in the District of Oregon and the Southern District of California, Defendants urge that courts "have held 'a claim by a plaintiff that he is the third-party beneficiary of a contract between a defendant and the federal government' satisfies the 'arising-under' prong of §1331 because plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law.'"[277]

Second, Defendants assert that federal issues are actually disputed as this case "will require the Court to determine what duties and obligations are imposed by the federal regulatory framework, which will require interpreting the River and Harbors Act, the Clean Water Act, and the Coastal

---

[273] *Id.*

[274] *Id.* at p. 17 (citing Rec. Doc. 1-2).

[275] *Id.*

[276] *Id.* at p. 18.

[277] *Id.* (quoting *Copeland-Turner v. Wells Fargo Bank, N.A.*, No. 11-37, 2011 WL 996706, at *5 (D. Or. Mar. 17, 2011)) (internal alterations omitted). Defendants also cite *Castillo v. Bank of Am., N.A.*, No. 12-1833, 2012 WL 4793240, at *4 (S.D. Cal. Oct. 9, 2012).

Zone Management Act."[278] Defendants further aver that the Court will have to resolve the following disputed issues:

> (1) whether the Board has exhausted required federal administrative procedures, (2) whether the Board can enforce federal permits to which it is not a party, (3) whether any of the Board's claims are properly litigated in a judicial forum and, if so, (4) what remedies are available as a matter of law.[279]

Third, Defendants contend that the federal issues are substantial.[280] Citing *Grable*, Defendants assert that "[a] substantial federal interest is one that indicates 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'"[281] Defendants maintain that "[t]he lands at issue in this lawsuit have been the subject of an extensive array of federal regulation, and adjudicating the Board's claims raises substantial and complex questions of federal policy in areas of coastal restoration, environmental protection, energy policy, national security, and interstate commerce."[282] Specifically, Defendants points to the statutes referenced in Plaintiff's Petition—the Clean Water Act, the Rivers and Harbors Act, and the Coastal Zone Management Act—as well as "other federal statutes, programs, and policies that directly address coastal land loss," such as the Energy Policy Act of 2005, the Coastal Wetlands Planning, Protection and Restoration Act of 1990, the Water Resources Development Act of 2007, national energy policy, and interstate commerce

---

[278] *Id.* at p. 19.

[279] *Id.*

[280] *Id.* at 20.

[281] *Id.* (quoting *Grable*, 545 U.S. at 313–14).

[282] *Id.*

generally.[283] Additionally, Defendants aver that Plaintiff "has sued virtually an entire industry" and "seeks mandatory injunctive relief on an unprecedented scale."[284]

Finally, Defendants argue that "denying remand will not disrupt the federal-state balance."[285] Defendants contend that "the State has no special interest in resolving the complex federal issues related to coastal zone management," and that "the state court will be required to make decisions that extend far beyond the concerns of Louisiana and its citizens."[286] "More fundamentally," Defendants contend that "given the substantial federal interests involved, those interests can be served only by exercising federal jurisdiction."[287]

### 3.    Natural Gas Act Defendants' Arguments in Opposition to Remand

The Natural Gas Act ("NGA") Defendants filed a "separate brief opposing remand to identify the important federal questions presented by the Plaintiff's Petition which are distinctly applicable to them as interstate natural gas pipelines regulated as 'natural gas companies' under the NGA [Natural Gas Act], and the FERC's [Federal Energy Regulatory Commission] implementing regulations."[288]

The NGA Defendants aver that "[t]he federal government exercises exclusive jurisdiction over rates, tariffs and facilities of natural gas companies engaged in the transportation of natural gas

---

[283] *Id.* at pp. 20–22.

[284] *Id.* at p. 24.

[285] *Id.* at p. 25.

[286] *Id.*

[287] *Id.* at p. 26.

[288] Rec. Doc. 254 at p. 8.

in interstate commerce."[289] The NGA Defendants explain that pursuant to the NGA, a "natural gas company"[290] must obtain a "certificate of public convenience and necessity" from FERC before it "constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce."[291] Further, FERC's review "involves environmental review of a proposed interstate natural gas pipeline project,"[292] during which FERC "considers environmental concerns, and specifically addresses the issues of soil preservation and land restoration."[293] According to the NGA Defendants, "FERC has imposed project-specific environmental requirements in each Certificate granted since NEPA [National Environmental Policy Act] was enacted in 1969," and "[e]ven pipelines certificated earlier are required to comply with environmental conditions as a result of the FERC's continuing exercise of supervision and jurisdiction over even routine facility modifications."[294] If a certificate holder follows certain FERC procedures, "then the 'certificate holder shall be deemed in compliance with' the Clean Water Act and Executive Orders related to potential effects on floodplains and wetlands."[295] "If the state determines that the activity under the blanket certificate is consistent with its coastal zone management plan or waives its right to review the project, then the blanked [sic] certificate holder also 'shall be deemed in compliance with the

---

[289] *Id.*

[290] "Natural gas company" refers to "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." *Id.* at p. 8 n.5 (quoting 15 U.S.C. § 717a(6)).

[291] *Id.* (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 302 (1988)) (internal quotation marks omitted).

[292] *Id.* at p. 9.

[293] *Id.* (quoting *N. Natural Gas Co. v. Iowa Util. Bd.*, 377 F.3d 817, 822 (8th Cir. 2004)) (internal quotation marks omitted).

[294] *Id.* at p. 10.

[295] *Id.* at p. 11 (quoting 18 C.F.R. § 157.206(b)(3)(iv)).

Coastal Zone Management Act.'"[296] Additionally, the NGA Defendants note that "[j]ust as the FERC has the authority to establish the conditions under which interstate natural gas pipelines may be placed in service, and maintained and operated, the FERC, and not a state court, is also responsible for implementing federal jurisdiction over the conditions under which such pipelines may be 'abandoned,' i.e., taken out of service."[297] The NGA Defendants further aver that under 15 U.S.C. § 717r, "[e]xclusive jurisdiction for review of FERC's actions rests in the United States Courts of Appeals."[298]

In light of this regulatory framework, the NGA Defendants maintain that "Plaintiff's claims present substantial federal questions."[299] Applying the *Grable* test, the NGA Defendants argue that Plaintiff's claims require the resolution of federal issues as "the injunctive relief that Plaintiff seeks as well as Plaintiff's tort and contract claims necessarily require the analysis and construction of the NGA, the FERC's implementing regulations, the FERC's certification and abandonment authority and the agency's orders."[300] Further, the NGA Defendants contend that this matter "raises federal issues regarding whether [Plaintiff] was required to exhaust available administrative remedies before bringing this action against NGA Defendants and whether the injunctive relief requested is consistent with the comprehensive regulatory scheme established by the NGA."[301]

---

[296] *Id.* (quoting 18 C.F.R. § 157.206(b)(3)(iii)).

[297] *Id.* at pp. 12–13 (citing 15 U.S.C. § 717f(b)).

[298] *Id.* at p. 21.

[299] *Id.* at p. 13.

[300] *Id.* at p. 14.

[301] *Id.*

With respect to the second prong of the *Grable* test, the NGA Defendants assert that the federal issues are actually disputed.[302] Specifically, the NGA Defendants dispute whether a Louisiana state court can "impose conditions of operation that differ from those required by the NGA certificates"; "authorize or require the suspension or termination of interstate natural gas pipeline operations"; "find that state tort and nuisance law can impose environmental duties and obligations that differ from or are in addition to those comprehended by the Certificates that FERC issued;" or "determine issues of compliance with federal environmental statutes that are included in the findings set out in FERC's blanket certificate regulations."[303]

Next, the NGA Defendants maintain that the federal issues are substantial as:

[t]he statutory interpretation required to determine whether state tort and nuisance law can define obligations that differ from FERC certificate conditions, whether certificates of public convenience and necessity issued under the NGA create third-party contract rights and whether injunctive relief can be permitted to interfere with FERC certificate, tariff and rate authority are issues of law. The determination of these issues will not be confined to the Louisiana coastal operations of the NGA Defendants. Rather they go to the heart of federal jurisdiction over interstate commerce engrained [sic] in jurisprudence since the turn of the prior century, more particularly whether the FERC's decisions actually define the balance and encompass local and national interests and even more narrowly whether belated disputes about the conditions of FERC Certificates can be presented in a state tribunal years out of time, rather than in a United States Court of Appeals in a timely manner.[304]

Finally, the NGA Defendants urge that federal jurisdiction will not disturb the balance of federal and state responsibilities, stating that "[t]he authorizations issued to the NGA Defendants have been considered to be enmeshed in interstate commerce subject to the authority of the federal government for almost a century and FERC's exclusive role under the NGA in reviewing and

---

[302] *Id.* at p. 22.

[303] *Id.* at pp. 22–23.

[304] *Id.* at pp. 24–25.

authorizing the construction and of [sic] interstate natural gas pipeline facilities necessarily entails interpretation of federal law."[305]

### 4.      Plaintiff's Reply to All Defendants in Further Support of Remand

First, Plaintiff contends that the Natural Gas Act Defendants' removal arguments are untimely.[306] Plaintiff points out that neither Chevron's "Notice of Removal"[307] nor the NGA Defendants' "Consent to Removal"[308] mention the NGA.[309] According to Plaintiff, "after the thirty-day period of 28 U.S.C. § 1446(b) has elapsed, 'any amendments to the removal notice must be made in accordance with 28 U.S.C. § 1653,' and . . . 'this section cannot be invoked to claim an entirely new and distinct jurisdictional basis.'"[310] Rather, "§ 1653 is limited to curing technical defects only."[311] Plaintiff argues that "[t]his principle holds fast whether a removing defendant is trying to invoke federal question jurisdiction untimely after only diversity jurisdiction has been raised in the removal notice, or whether the removing defendant is untimely attempting to add a distinct basis for federal question jurisdiction from the federal question bases asserted in the removal notice."[312]

---

[305] *Id.* at pp. 27–28.

[306] Rec. Doc. 292 at p. 10.

[307] Rec. Doc. 1.

[308] Rec. Doc. 63.

[309] Rec. Doc. 292 at p. 10.

[310] *Id.* at p. 11 (quoting *Energy Catering Servs., Inc. v. Burrow*, 911 F. Supp. 221, 222 (E.D. La. 1995) (Mentz, J.)) (internal alterations omitted).

[311] *Id.*

[312] *Id.*

Second, Plaintiff asserts that "[n]one of the Authority's claims are created by federal law."[313] Plaintiff avers that under *Mims*, "when federal law creates a private right of action **and** furnishes the substantive rules of decision, the claim arises under federal law, and district courts possess federal-question jurisdiction under § 1331."[314] According to Plaintiff, "none of the Authority's claims involves [sic] a private right of action created by federal law."[315]

Third, Plaintiff argues that none of its claims arise under federal law pursuant to *Grable*. Plaintiff contends that "[n]umerous courts have recognized that where there are alternative, non-federal bases for liability on a state-law cause of action, there is no 'necessary' federal law question that opens the doors of federal jurisdiction."[316] Acknowledging that "[t]he Authority has alleged the violation of federal regulations, statutes, and permits as providing the backdrop for liability under Louisiana law," Plaintiff nevertheless asserts that it "has also identified state rights-of-way, Louisiana tort law, and the Louisiana law of obligations as the fount of its legal theories."[317] Additionally, Plaintiff maintains that no federal issues are actually disputed as "[t]here is a settled framework of environmental laws that the Authority seeks to apply to the facts of its case."[318] Plaintiff represents that "[i]t does not seek novel interpretations of statutes or regulations; rather, it seeks to use the settled framework of those statutes and regulations to inform its state-law legal

---

[313] *Id.* at p. 13.

[314] *Id.* (quoting *Mims*, 132 S. Ct. 748–49) (emphasis in original).

[315] *Id.* at p. 14.

[316] *Id.* at p. 16 (citing, *e.g.*, *Stephens Cnty. v. Wilbros, LLC*, No. 12-201, 2012 WL 4888425 (N.D. Ga. Oct. 6, 2012)).

[317] *Id.* at p. 17.

[318] *Id.* at p. 21.

theories.'"[319] Next, Plaintiff asserts that any federal issues are not substantial.[320] Citing *Gunn*, Plaintiff

contends that "an issue is important to 'the federal system as a whole' when the issue implicates the

federal government's 'direct interest in the availability of a federal forum to vindicate its own

administrative action' or when an issue requires the determination of 'the constitutional validity of

an act of Congress.'"[321] Further, Plaintiff cites *Grable* for the proposition that "the lack of a private

right of action 'is an important clue to Congress's conception of the scope of jurisdiction to be

exercised under § 1331.'"[322] With respect to prong four, Plaintiff avers that adjudicating this case

in federal court would upset the federal-state balance.[323] Again citing *Grable*, Plaintiff argues that

because the violation of federal statutes is commonly given negligence *per se* effect in state tort

actions, "a general rule of exercising federal jurisdiction over state tort claims resting on federal

statutory violations would thus herald a potentially enormous shift of traditionally state cases into

federal courts."[324]

Finally, Plaintiff observes that "[f]or the most part, Defendant's arguments amount to a

preview of their anticipated defenses to the Authority's claims."[325] Plaintiff contends that "[i]t is

---

[319] *Id.*

[320] *Id.* at p. 22.

[321] *Id.* at p. 22 (quoting *Gunn*, 133 S. Ct. at 1066).

[322] *Id.* at p. 29 (quoting *Grable*, 545 U.S. at 318).

[323] *Id.* at p. 30.

[324] *Id.* at pp. 30–31 (quoting *Grable*, 545 U.S at 319) (internal quotation marks and alterations omitted).

[325] *Id.* at p. 33.

well-settled, however, that a defense raised under federal law will not suffice to transform a plaintiff's state-law petition into one that arises under federal law."[326]

### 5.    Natural Gas Act Defendants' Sur-Reply in Opposition to Remand

In their sur-reply, the NGA Defendants contend that "[b]oth the Chevron Notice [of Removal] and the NGA Opposition adequately describe the grounds for removal based on federal question jurisdiction in compliance with § 1446."[327] Further, the NGA Defendants assert that "[e]ven if the Court treats the NGA Opposition as an amendment [to the Notice of Removal], such amendment is permitted under Fifth Circuit precedent."[328]

## B.    Timeliness of Natural Gas Act Arguments

### 1.    Applicable Law

To remove an action from state to federal court, 28 U.S.C. § 1446 requires that a defendant file a notice of removal, "containing a short and plain statement of the grounds for removal,"[329] "within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based . . . ."[330] During this thirty-day period, a defendant may freely amend its notice of removal.[331] After thirty days, however, "defendants may amend the notice only to set out more specifically the

---

[326] *Id.*

[327] Rec. Doc. 296 at p. 4.

[328] *Id.* at p. 7 (citing *D. J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.*, 608 F.2d 145 (5th Cir. 1979)).

[329] 28 U.S.C. § 1446(a).

[330] 28 U.S.C. § 1446(b).

[331] *See Energy Catering*, 911 F. Supp. 221 at 222–23 (citing *Moody v. Commercial Ins. Co.*, 753 F. Supp. 198 (N.D. Tex. 1990); *Mayers v. Connell*, 651 F. Supp. 273, 274 (M.D. La. 1986)); *see also* 14C Charles Alan Wright, et al., *Federal Practice and Procedure* § 3733 (4th ed. 2013).

grounds for removal that already have been stated, albeit imperfectly, in the original notice," and "may not add completely new grounds for removal."[332] Courts may construe documents offered in opposition to a motion to remand as an amendment to a notice of removal.[333]

### 2. Analysis

In its "Notice of Removal," Defendant Chevron asserts that this matter is removable because "a significant and substantial component of Plaintiff's state law claims requires the interpretation of federal law, and Plaintiff's right to relief under one or more causes of action asserted depends upon resolution of a substantial question of federal law, and therefore, federal question jurisdiction applies."[334] Chevron notes that Plaintiff's Petition identifies a number of federal statutes, specifically the River and Harbors Act of 1899, the Clean Water Act of 1972, and the Coastal Zone Management Act of 1972.[335] Further, Chevron recounts the "extraordinary injunctive relief" Plaintiff seeks, and avers:

> All of these activities fall into the realm of a federal regulatory framework that is pervasive and comprehensive. None of these forms of relief can be performed without federal regulatory involvement and permission. In addition, all of these activities, if ordered, will necessarily interfere with the exploration, production, and transportation of oil and gas in interstate commerce—a matter of national concern.

---

[332] 14C Charles Alan Wright, et al., *Federal Practice and Procedure* § 3733 (4th ed. 2013).

[333] *See, e.g.*, *Willingham v. Morgan*, 395 U.S. 402, 407 n.3 (1969) (treating affidavits filed in support of a motion for summary judgment as an amendment to a petition for removal); *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 205 n.12 (3rd Cir. 2003) (explaining a court may "consider jurisdictional facts contained in later-filed affidavits as amendments to the removal petition where, as here, those facts merely clarify (or correct technical deficiencies in) the allegations already contained in the original notice"); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n.1 (9th Cir. 2002) (concluding that the district court did not err in construing an opposition to a motion to remand as an amendment to the notice of removal); *Wang v. Asset Acceptance, LLC*, 680 F. Supp. 2d 1122, 1125 (N.D. Cal. 2010) (treating evidence offered in opposition to a motion to remand as an amendment to the notice of removal); *Carter v. Monsanto Co.*, 635 F. Supp. 2d 479, 487 (S.D. W. Va. 2009) ("Where subsequently filed documents clarify allegations already stated in the notice of removal, a court may construe those documents as amending the notice of removal.").

[334] Rec. Doc. 1 at p. 4.

[335] *Id.* at pp. 5–6.

Moreover, all of these activities, if ordered, will create a high risk of being inconsistent with or interfering with federal energy policy and/or ongoing coastal restoration projects sponsored in large part by the federal government.[336]

The lack of an express reference to the Natural Gas Act or FERC regulations in Chevron's "Notice of Removal" does not warrant excluding the NGA Defendants' arguments as untimely. As noted above, the Notice of Removal discusses the "pervasive and comprehensive" federal regulatory framework governing the oil and gas industry, and notes that the requested injunctive relief may conflict with "federal energy policy."[337] The NGA Defendants' opposition to the "Motion to Remand" provides additional levels of detail on the specific aspects of the federal regulatory framework that apply in the natural gas context. It does not assert an entirely new basis for federal jurisdiction.

The cases cited by Plaintiff address situations in which a defendant raised a new basis for jurisdiction, not where the defendant elaborated on a basis discussed in the notice of removal. For example, in *Stanley v. Wyeth, Inc.*, the defendant initially asserted that the case came under 28 U.S.C. § 1442(a)(1)'s "federal officer" removal provision, but later argued that the court had federal question jurisdiction under 28 U.S.C. § 1331 or diversity jurisdiction under 28 U.S.C. § 1332.[338] Similarly, in *Augustine v. Alliance Insurance Agency Services, Inc.*, the defendant removed on the grounds of federal question jurisdiction, but, in opposition to a motion to remand, suggested that the court had diversity jurisdiction.[339]

---

[336] *Id.* at pp. 16–17.

[337] *Id.* at p. 16.

[338] *See Stanley v. Wyeth, Inc.*, No. 06-1979, 2006 WL 2588147, at *1–*2 (E.D. La. Sept. 8, 2006) (Barbier, J.).

[339] *See Augustine v. Alliance Ins. Agency Servs. Inc.*, 06-9062, 2007 WL 38320, *2 (E.D. La. Jan. 3, 2007) (Feldman, J.).

Accordingly, the Court finds that the NGA Defendants' arguments are timely and will address them on the merits.

## C.   Whether Plaintiff's Claims Arise Under Federal Law

### 1.   Applicable Law

Pursuant to 28 U.S.C. § 1331, "Congress has authorized the federal district courts to exercise original jurisdiction in 'all civil actions arising under the Constitution, laws, or treaties of the United States.'"[340] Often called "federal-question jurisdiction," this type of jurisdiction "is invoked by and large by plaintiffs pleading a cause of action created by federal law (*e.g.*, claims under 42 U.S.C. § 1983)."[341] A single claim over which federal-question jurisdiction exists is sufficient to allow removal.[342]

### a.   Created By Federal Law: The "Well-Pleaded Complaint" Rule

In evaluating whether a plaintiff's cause of action is created by federal law, courts must apply the "well-pleaded complaint" rule. That is, "a federal court has original or removal jurisdiction only if a federal question appears on the face of the plaintiff's well-pleaded complaint; generally, there is no federal jurisdiction if the plaintiff pleads only a state law cause of action."[343] Even where a federal remedy is also available, the "plaintiff is the master of his complaint and may generally

---

[340] *Gunn*, 133 S. Ct. at 1064 (quoting 28 U.S.C. § 1331).

[341] *Grable*, 545 U.S. at 312; *see also Gunn*, 133 S. Ct. at 1064 ("Most directly, a case arises under federal law when federal law creates the cause of action asserted.").

[342] *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005); *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–66 (1997).

[343] *Bernhard v. Whitney Nat'l Bank*, 523 F.3d 546, 551 (5th Cir. 2008).

allege only a state law cause of action."[344] Further, "[a] defense that raises a federal question is inadequate to confer jurisdiction."[345]

### b. Exceptions to the "Well-Pleaded Complaint Rule": Complete Pre-Emption and Substantial Question of Federal Law

### i. Complete Pre-Emption

There are "two recognized exceptions to the well-pleaded complaint rule."[346] First, there is the "complete pre-emption corollary to the well-pleaded complaint rule."[347] Normally, federal pre-emption is raised as a defense to the allegations of a plaintiff's complaint.[348] As the Supreme Court explained in *Caterpillar Inc. v. Williams*, generally "a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question at issue."[349] Complete pre-emption is an exception to this general rule. "On occasion, the Court has concluded that the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for the purposes of the well-pleaded complaint rule.'"[350] That is, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal

---

[344] *Id.*

[345] *Merrell Dow*, 478 U.S. at 808.

[346] *Devon Energy Production Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1203 (10th Cir. 2012).

[347] *Caterpillar*, 482 U.S. at 393.

[348] *Id.* at 392.

[349] *Id.* at 393 (emphasis in original).

[350] *Id.* (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)).

claim, and therefore arises under federal law."[351] In *Hoskins v. Bekins Van Lines*, the Fifth Circuit

instructed that for the complete pre-emption doctrine to apply, the removing defendant must show:

> (1) the [federal] statute contains a civil enforcement provision that creates a cause
> of action that both replaces and protects the analogous area of state law; (2) there is
> a specific jurisdictional grant to the federal courts for enforcement of the right; and
> (3) there is clear Congressional intent that claims brought under the federal law be
> removable.[352]

### ii.    Substantial Question of Federal Law

Second, there is a "special and small" category of cases in which a state law cause of action

can give rise to federal-question jurisdiction because the claim involves important federal issues.[353]

This exception "captures the commonsense notion that a federal court ought to be able to hear claims

recognized under state law that nonetheless turn on substantial questions of federal law, and thus

justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on

federal issues."[354] In *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,

the Supreme Court instructed that the presence of a federal issue is not "a password opening federal

courts to any state action embracing a point of federal law."[355] Rather, "federal jurisdiction over a

state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3)

substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance

---

[351] *Id.* (citing *Franchise Tax Bd. of the State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 24 (1983)); *see also Black's Law Dictionary* 324 (9th ed. 2009) (defining the "complete-preemption doctrine" as "[t]he rule that a federal statute's preemptive force may be so extraordinary and all-encompassing that it converts an ordinary state-common-law complaint into one stating a federal claim for the purposes of the well-pleaded-complaint rule").

[352] *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 775 (5th Cir. 2003) (quoting *Johnson v. Baylor Univ.*, 214 F.3d 630, 632 (5th Cir. 2000)) (emphasis omitted).

[353] *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006).

[354] *Grable*, 545 U.S. at 312.

[355] *Id.* at 314.

approved by Congress."[356] If all four requirements are met, "jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts."[357]

2.    **Analysis**

a.    **Whether Plaintiff's Claims Are Created by Federal Law Pursuant to the "Well-Pleaded Complaint" Rule**

In its petition, Plaintiff asserts six causes of action: (1) negligence under Louisiana Civil Code article 2315,[358] (2) strict liability Louisiana Civil Code articles 2317 and 2317.1,[359] (3) natural servitude of drain under Louisiana Civil Code article 656,[360] (4) public nuisance,[361] (5) private nuisance under Louisiana Civil Code article 667,[362] and (6) breach of contract—third party beneficiary.[363] All of these causes of action are created by Louisiana, not federal, law.

In arguing to the contrary, Defendants rely heavily on *Mims v. Arrow Financial Services, LLC*; however, they fundamentally misconstrue the issue in *Mims*. In *Mims*, the plaintiff filed suit in federal court asserting a claim pursuant to the Telephone Consumer Protection Act of 1991

---

[356] *Gunn*, 133 S. Ct. at 1065 (citing *Grable*, 545 U.S. at 314).

[357] *Id.* (quoting *Grable*, 545 U.S. at 313–14).

[358] Rec. Doc. 1 at p. 17–18.

[359] *Id.* at p. 18–19.

[360] *Id.* at p. 19–20.

[361] *Id.* at p. 20–21.

[362] *Id.* at p. 21–22.

[363] *Id.* at p. 22–23.

("TCPA").[364] The TCPA banned certain telemarketing practices and specifically provided a private

right of action for violations of the statute:

> A person or entity may, if otherwise permitted, by the laws or rules of court of a
> State, bring in an appropriate court of that State—
>
> (A)     an action based on a violation of this subsection or the regulations prescribed
>         under this subsection to enjoin such violation,
>
> (B)     an action to recover for actual monetary loss from such violation, or to
>         receive $500 in damages for each such violation, whichever is greater, or
>
> (C)     both such actions.[365]

The Supreme Court noted in *Mims* that there was no debate that the TCPA provided plaintiff's right

of action; a subsection of the statute was expressly entitled "private right of action."[366] Rather, the

question in *Mims* was whether the statute, by permitting an action in state court, divested federal

district courts of jurisdiction.[367] Unlike *Mims*, Defendants here have not pointed to any federal

statute that provides for a private right of action. The question in this matter is not whether Congress

has divested federal courts of jurisdiction, it is whether federal district courts have jurisdiction in

the first place.

     Thus, applying the well-pleaded complaint rule, the Court concludes that Plaintiff's claims

are not created by federal law and that it does not have jurisdiction on this basis.

---

[364] *Mims*, 132 S. Ct. at 744.

[365] 47 U.S.C. § 227(b)(3).

[366] *See Mims*, 132 S. Ct. at 748 ("Because federal law creates the right of action and provides the rules of
decision, Mim's TCPA claim, in 28 U.S.C. § 1331's words, plainly 'arises under' the 'laws of the United States.'")
(internal alterations omitted); *see also* 47 U.S.C. § 227(b)(3).

[367] *See id.* at 744–45 ("The question presented is whether Congress' provision for private actions to enforce
the TCPA renders state courts the *exclusive* arbiters of such actions.") (emphasis in original).

**b.**     **Whether an Exception to the "Well-Pleaded Complaint" Rule Applies**

**i.**     **Whether the Complete Pre-Emption Doctrine Applies**

As discussed above, normally, federal pre-emption is raised as a defense to the allegations of a plaintiff's complaint and may not serve as a basis for removing a case to federal court.[368] However, "a state claim may be removed to federal court . . . when a federal statute wholly displaces the state-law cause of action through complete pre-emption."[369]

The Defendants' primary memorandum in opposition does not address pre-emption as a federal defense or in the context of the complete pre-emption doctrine. Although the Natural Gas Act Defendants' opposition discusses pre-emption,[370] it neither expressly references the complete pre-emption doctrine nor discusses the seminal Supreme Court or Fifth Circuit cases articulating the complete pre-emption doctrine.[371] Thus, it appears that the Natural Gas Act Defendants are not arguing that complete pre-emption applies. They discuss pre-emption in its normal context as a federal defense, which does not provide grounds for removal, rather than as an exception or corollary to the well-pleaded complaint rule. Further, the Natural Gas Act Defendants do not point to any civil enforcement provision in the Natural Gas Act or other federal statute, which would be

---

[368] *See Caterpillar*, 482 U.S. at 392–93.

[369] *Hoskins*, 343 F.3d 769 (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)) (internal quotation marks omitted).

[370] *See e.g.*, Rec. Doc. 254 at pp. 8–13 (discussing "the comprehensive scheme of federal regulation"), p. 18 (mentioning "the pre-emptive effect of the NGA), p. 19 (averring that "issues of federal preemption exist").

[371] *See, e.g.*, *Caterpillar*, 482 U.S. at 393–94; *Metro. Life Ins. Co.*, 481 U.S. at 65; *Franchise Tax Bd.*, 463 U.S. at 24; *Hoskins*, 343 F.3d at 775.

required to establish complete pre-emption under *Hoskins*.[372] Accordingly, the Court determines that it does not have jurisdiction based on the complete pre-emption doctrine.

### ii.   Whether Plaintiff's Claims Raise a Substantial Issue of Federal Law

As explained above, under an exception to the "well-pleaded complaint" rule, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."[373] The Court addresses these four requirements in turn.

---

[372] In contending that Plaintiff's claims necessarily raise a substantial federal issue, the Natural Gas Act Defendants offer arguments that allude to pre-emption. Specifically, the NGA Defendants aver that "Plaintiff's Petition fails to set forth the standard of care to which the NGA Defendants were expected to adhere" and that "Plaintiff attempts to side-step that the standard of care that applies to interstate natural gas pipelines is established by the NGA." Rec. Doc. 254 at p. 19. According to the NGA Defendants, "[t]he duties that apply to the NGA Defendants can only be defined by referring to, relying upon, and interpreting the Certificates authorizing the siting, construction and operation of their interstate natural gas pipelines, including their environmental conditions. Defining those duties entails balancing local concerns, including local environmental concerns and national interests, a function Congress delegated to the FERC." *Id.*

The NGA Defendants' assertion that the Natural Gas Act and FERC regulations provide the proper standard of care, however, is more accurately characterized as the affirmative defense of preemption, which does not support federal-question jurisdiction. In *Simmons v. Sabine River Authority of Louisiana*, the Fifth Circuit addressed a negligence claim brought against the operator of a hydroelectric dam and state waterway authority, alleging that the defendants should have maintained a higher minimum reservoir elevation. *See* 732 F.3d 469, 472 (5th Cir. 2013). Defendants argued that plaintiffs' claims were subject to preemption, as FERC, through the Federal Power Act ("FPA"), had exclusive control over dam operations. *See id.* at 473. The Fifth Circuit held that plaintiffs' claims were preempted "[b]ecause the state law property claims at issue here infringe on FERC's operational control." *Id.* at 476. The court explained that "[a]pplying state tort law to set the duty of care for the operation of FERC-licensed projects would 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives' of the FPA. . . . [T]he district court properly concluded that the FPA preempts Plaintiffs' claims for negligence." *Id.* at 477 (quoting *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012)). In this manner, the Natural Gas Act Defendants' argument that the statutes and regulations governing FERC licensees provides the standard of care closely parallels the arguments made in *Simmons*, which were evaluated as the affirmative defense of pre-emption.

As noted above, under the Supreme Court decision in *Caterpillar Inc. v. Williams*, "a case may *not* be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question at issue." *Caterpillar*, 482 U.S. at 392 (emphasis in original). Accordingly, the Natural Gas Act Defendants' argument that the standard of care cannot conflict with the Natural Gas Act and FERC requirements does not provide a basis for federal-question jurisdiction.

[373] *Gunn*, 133 S. Ct. at 1065 (citing *Grable*, 545 U.S. at 314).

65

(a)        **Necessarily Raised**

A federal issue is "necessarily raised" when a court must apply federal law to the facts of the plaintiff's case.[374] "Where a federal issue is present as only one of multiple theories that could support a particular claim," however, courts have determined that the federal question is insufficient to establish jurisdiction.[375] Having reviewed the Petition, the Court finds that at least three of Plaintiff's six claims necessarily raise a federal issue.

In Count 1 of its Petition, Plaintiff brings a claim for negligence under Louisiana Civil Code article 2315.[376] In order to prevail on this claim, Plaintiff must prove that (1) Defendants' conduct was the cause-in-fact of the resulting harm; (2) Defendants owed Plaintiff a duty of care; (3) the requisite duty was breached by Defendants; and (4) the risk of harm was within the scope of protection afforded by the duty breached.[377] According to the Petition, the duty in this case is established by a "longstanding and extensive regulatory framework under both federal and state law."[378] Specifically, the Petition describes three federal statutes. First, the Rivers and Harbors Act of 1899 "prohibits the unauthorized alteration of or injury to levee systems and other flood control measures built by the United States."[379] Next, the Clean Water Act of 1972 requires Defendants to "[m]aintain canals and other physical alterations as originally proposed; [r]estore dredged or

---

[374] *Id.* at 1065 (noting that adjudicating plaintiff's claim "will necessarily require application of patent law to the facts of [plaintiff's] case").

[375] *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005); *see also, e.g.*, *Stephens Cnty v Wilbros, LLC*, No. 12-201, 2012 WL 4888425, at *2 (N.D. Ga. Oct. 6, 2012).

[376] Rec. Doc. 1-2 at p. 17.

[377] *Peterson v. Gibraltar Sav. and Loan*, 98-1601 (La. 5/18/99), 733 So. 2d 1198, 1203–04.

[378] Rec. Doc. 1-2 at p. 16.

[379] *Id.*

66

otherwise modified areas to their natural state upon completion of their use or their abandonment; and [m]ake all reasonable efforts to minimize the environmental impact of the Defendants' activities."[380] Finally, the Coastal Zone Management Act of 1972 imposes "a litany of duties and obligations expressly designed to minimize the adverse ecological, hydrological, topographical, and other environmental effects" associated with oil and gas activities.[381] The Petition also mentions "[r]egulations related to rights-of-way granted across state-owned lands and water bottoms administered by the Louisiana Office of State Lands"[382] as well as "Louisiana coastal zone regulations."[383] However, aside from these general references, the Petition never points to any specific Louisiana statutes or regulations.

By turning to federal law to establish the standard of care, Plaintiff "necessarily raises" what duties these laws impose upon Defendants. In determining whether Plaintiff may prevail on its claim for negligence, the Court will have to interpret federal law to ascertain, among other issues, whether Defendants' conduct constitutes an unauthorized alteration or injury to the levee systems under the Rivers and Harbors Act, whether the Clean Water Act required Defendants to restore allegedly abandoned dredged canals, and what steps the Coastal Zone Management Act required Defendants to take to minimize adverse environmental effects. These three federal statutes do not merely present "one of multiple theories" that could support Plaintiff's negligence claim. Rather, they are the only specific sources of the duty Plaintiff must establish in order to prevail. Indeed, another Court in this district determined in *Barasich v. Columbia Gulf Transmission Co.* that oil and gas companies do

---

[380] *Id.*

[381] *Id.* at p. 17.

[382] *Id.* at p. 16.

[383] *Id.* at p. 17.

not have a duty under Louisiana law to protect members of the public "from the results of coastal erosion allegedly caused by [pipeline] operators that were physically and proximately remote from plaintiffs or their property."[384] Accordingly, Plaintiff's negligence claim necessarily involves the application of federal law.[385]

In Count 4 of the its Petition, Plaintiff asserts a claim for public nuisance.[386] "A public nuisance is an unreasonable interference with a right common to the general public."[387] In assessing whether a defendant's conduct constitutes a public nuisance, courts consider "whether the conduct involves a significant interference with public health, safety, peace, comfort, or convenience."[388] According to the Petition, "Defendants' continuing acts and/or omissions . . . have caused, and will continue to cause, the extensive weakening and loss of coastal lands in the Buffer Zone constituting an unreasonable interference with the health, safety, peace, and/or comfort of southeast Louisiana

---

[384] *Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 693 (2006) (Vance, J.).

[385] In contending that Plaintiff's claims necessarily raise a federal question, the Natural Gas Act Defendants offer arguments distinct from those addressed in the main Defendants' brief. The main Defendants contend that a federal question is necessarily raised because Plaintiff's Petition expressly incorporates the Rivers and Harbors Act, the Clean Water Act, and the Coastal Zone Management Act in defining the standard of care. The Natural Gas Act Defendants, however, cite federal law not addressed in Plaintiff's Petition in their supplemental opposition to the Motion to Remand. The Natural Gas Act Defendants aver that "Plaintiff's Petition fails to set forth the standard of care to which the NGA Defendants were expected to adhere" and that "Plaintiff attempts to side-step that the standard of care that applies to interstate natural gas pipelines is established by the NGA." Rec. Doc. 254 at p. 19. According to the Natural Gas Act Defendants, "[t]he duties that apply to the NGA Defendants can only be defined by referring to, relying upon, and interpreting the Certificates authorizing the siting, construction and operation of their interstate natural gas pipelines, including their environmental conditions. Defining those duties entails balancing local concerns, including local environmental concerns and national interests, a function Congress delegated to the FERC." *Id.*
However, as discussed in footnote 372, the NGA Defendants' argument is more accurately characterized as the defense of pre-emption and does provide a basis for federal-question jurisdiction.

[386] Rec. Doc. 1-2 at p. 20.

[387] 4 A. N. Yiannopoulos, *Louisiana Civil Law Treatise, Predial Servitudes* § 3:31 (4th ed. 2013) (citing *Restatement (Second) of Torts* § 821B (1979)).

[388] *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 289 (5th Cir. 2001) (citing *Restatement (Second) of Torts* § 821B (1979)).

communities as those acts and/or omissions have, and continue to, expose communities to increased storm surge risk."[389] The Petition avers that this "unreasonable interference is in violation of the standard of care as prescribed in the regulatory framework."[390] As discussed above in the context of Plaintiff's negligence claim, by turning to federal law to establish the standard of care, Plaintiff "necessarily raises" what conduct constitutes "unreasonable interference" under the Rivers and Harbors Act, the Clean Water Act, and the Coastal Zone Management Act. Accordingly, Plaintiff's public nuisance claim necessarily involves the application of federal law.

Finally, in Count 6 of its Petition, Plaintiff brings a claim as a third-party beneficiary for breach of contract.[391] According to the Petition, "[t]he express obligations and duties contained in the permit(s) and right(s)-of-way identified in the Exhibits [attached to the Petition] and governing Defendants' activities all require that Defendants not impair the Buffer Zone."[392] Plaintiff asserts that these permits and rights-of-way "all manifest an intent to confer a direct and certain benefit to the Authority and/or the levee districts that it governs," and therefore Plaintiff is a third-party beneficiary entitled to recover for breach of contract.[393] The Court notes that at least some of the dredging permits identified in the exhibits to the Petition are federal permits, issued pursuant to federal law.[394]

---

[389] Rec. Doc. 1-2 at p. 20.

[390] *Id.* at p. 21.

[391] *Id.* at p. 22.

[392] *Id.*

[393] *Id.*

[394] For example, Plaintiff's Petition identifies the "Lake Borgne 59" permit issued to Chevron Oil Company on December 23, 1975. Rec. Doc. 1-2 at p. 113. This permit was issued by the Department of the Army pursuant to the River and Harbors Act and the Federal Water Pollution Control Act. Rec. Doc. 260-6 at pp. 2–18.

69

Plaintiff contends that no necessary federal question is raised by its third party beneficiary claim because that claim "is a creature of Louisiana law that does not require the court to evaluate the legality of any agency action or interpret any federal statutes."[395] On the other hand, Defendants cite *Copeland-Turn v. Wells Fargo Bank, N.A.*, a case from the District of Oregon, for the proposition that "'a claim by plaintiff that he is the third-party beneficiary of a contract between a defendant and the federal government' satisfies 'the arising under' prong of § 1331 because the plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law."[396]

The reality is more complicated than either party admits. There appears to be no bright-line rule regarding what law governs a third-party beneficiary claim based on a contract to which the United States is a party. Rather, numerous courts have grappled with whether to apply state contract law or federal common law.

In the 1977 case *Miree v. DeKalb County*, the Supreme Court considered a breach of contract claim brought by survivors of passengers who died in an airplane crash.[397] Federal jurisdiction was based on diversity of citizenship, and thus the substantive law of the forum state would normally apply under *Erie Railroad Co. v. Tompkins*.[398] Plaintiffs argued that they were third-party beneficiaries of a contract between DeKalb County, Georgia and the Federal Aviation Administration ("FAA").[399] In exchange for federal funding, the contract obligated the county to

---

[395] Rec. Doc. 292 at p. 18.

[396] Rec. Doc. 260 at p. 18 (quoting *Copeland-Turner*, 2011 WL 9960706, at *5).

[397] *Miree v. DeKalb Cnty, Ga.*, 433 U.S. 25, 26 (1977).

[398] *Id.* at 28 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[399] *Id.* at 27.

"take action to restrict the use of land adjacent to or in the immediate vicinity of the Airport to activities and purposes compatible with normal airport operations."[400] Plaintiffs argued that the county breached the contract by maintaining a garbage dump next to the airport and that birds swarming around the dump flew into the plane's engine, causing the crash.[401] The Fifth Circuit applied federal common law and determined that the plaintiffs did not have standing to sue as third-party beneficiaries.[402] However, the Supreme Court held that Georgia law should have been applied to determine whether plaintiffs were third-party beneficiaries.[403] In concluding that state law applied, the Court observed the case raised no questions regarding the rights and duties of the United States, did not threaten the federal fisc, and presented only a speculative federal interest.[404] Nevertheless, the Supreme Court acknowledged that federal common law may apply in diversity cases when "a uniform national rule is necessary to further the interest of the federal government."[405] While *Miree* discussed choice of law issues in the context of a diversity case, courts have since interpreted this language for the broader proposition that federal common law may apply in lieu of state substantive law, giving rise to a federal question in cases between non-diverse parties.[406]

The Supreme Court as well as several appellate courts have since distinguished *Miree*. In *Boyle v. United Technologies Corp.*, decided in 1988, the Supreme Court acknowledged that under

---

[400] *Id.*

[401] *Id.*

[402] *Id.* at 27–28.

[403] *Id.* at 32–33.

[404] *See id.* at 28–33.

[405] *Id.* at 29 (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943)).

[406] *See Almond v. Capital Properties, Inc.*, 212 F.3d 20 (1st Cir. 2000) (discussed *infra*); *Price v. Pierce*, 823 F.2d 1114 (7th Cir. 1987) (discussed *infra*).

*Miree*, "i[t] is true that where litigation is purely between private parties and does not touch the rights and duties of the United States, federal law does not govern."[407] However, in *Boyle*, the Court declined to follow *Miree* and held that federal law applied to a product liability suit by survivors of a Marine killed in a helicopter crash against the helicopter manufacturer.[408] The Court explained:

> The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.[409]

*Miree* was also distinguished by the Seventh Circuit in *Price v. Pierce*.[410] There, the court addressed a third-party beneficiary claim for breach of a contract between the Illinois Housing Developing Authority and various developers.[411]  Plaintiffs alleged that the developers breached their contractual obligations to set aside forty percent of all apartments for lower-income families.[412] The contract at issue was authorized by federal statute and approved by the Department of Housing and Urban Development ("HUD").[413] In assessing whether jurisdiction was proper, the Seventh Circuit concluded that the case arose under federal law because federal common law applied to whether plaintiffs were third-party beneficiaries, and whether the developers had breached the

---

[407] *Boyle v. United Technologies Corp.*, 487 U.S. 500, 506 (1988).

[408] *Id.* at 507.

[409] *Id.*

[410] 823 F.2d 1114 (7th Cir. 1987).

[411]  *See id.* at 1117–18.

[412] *See id.*

[413] *See id.*

contract.[414] The court expressly distinguished *Miree*, explaining that the federal interest at stake in *Price* was "particularly strong":

> [I]t would be odd to think that a suit by tenants and applicants for federally subsidized housing against developers of such housing for breach of contracts approved by HUD and fundamental to the achievement of HUD's objectives . . . would have to be brought in state court and decided in accordance with state contract law.[415]

Further, the Seventh Circuit noted the "desirability of a uniform interpretation of these contracts," and suggested that uniform interpretation "will best be achieved by allowing suit in federal courts."[416]

The First Circuit adopted the reasoning of *Price* in *Almond v. Capital Properties, Inc.*[417]  In *Almond*, defendant Capital Properties entered into an agreement with the Federal Railroad Administration ("FRA") whereby the FRA agreed to pay fifty percent of the cost of a new garage at a railroad station in Providence, Rhode Island.[418] As part of the agreement, the FRA retained the right to approve any changes in public parking rates.[419] When Capital Properties eliminated a monthly discount for commuters, the governor of Rhode Island and the state Department of Transportation brought an action in state court to enjoin the rate increase under a breach-of-contract

---

[414] *Id.* at 1120–21.

[415] *Id.* at 1120.

[416] *Id.*

[417] 212 F.3d 20 (1st Cir. 2000).

[418] *Id.* at 21.

[419] *Id.*

theory.[420] Capital Properties removed the case to federal court.[421] Examining its jurisdiction *sua sponte*, the First Circuit expressly adopted the reasoning of *Price*,[422] and held that federal-question jurisdiction existed "because the complaint necessarily presents and turns on a contractual obligation to the United States."[423]

Therefore, in light of the forgoing caselaw, it appears that federal law applies to "nonparty breach of contract claims where the contract implicated a federal interest, the United States was a party to the contract, and the contract was entered into pursuant to federal law."[424] At least some of the dredging permits characterized by the Plaintiff as "contracts" for the purposes of its third-party beneficiary claim were entered into by the United States (specifically, the Army Corps of Engineers) and Defendants pursuant to federal law, including the River and Harbors Act.[425] Further, the dredging permits at issue implicate the important federal interests in coastal land management, sound energy policy, and developing natural resources.[426] As *Price* observed, "it would be odd to

---

[420] *Id.* at 21–22.

[421] *Id.* at 22.

[422] *Id.* at 24.

[423] *Id.* at 22. Similarly, the Ninth Circuit has held that "[f]ederal law governs the interpretation of contracts entered into pursuant to federal law and to which the government is a party." *Smith v. Central Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005).

[424] *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 180 n.9 (D. Mass. 2011) (synthesizing *Miree*, *Price*, *Almond*, and *Smith*).

[425] *See* Rec. Doc. 260-6, Permit issued by the Department of the Army to Chevron Oil Company, dated December 23, 1975; Rec. Doc. 260-7, Permit issued by the Department of the Army to Arco Oil and Gas Company, dated June 11, 1981.

[426] *See, e.g.*, 16 U.S.C. § 1451 ("The Congress finds that . . . (a) There is a national interest in the effective management, beneficial use, protection and development of the coastal zone."); 30 U.S.C. § 1602 ("The Congress declares that it is the continuing policy of the United States to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production with appropriate attention to a long-term balance between resource production, energy use, a healthy environment, natural resources conversation, and social needs.").

think" that a suit by a state entity against the entire oil and gas industry for breach of permits approved by the Army Corps of Engineers and "fundamental to the achievement" of national environmental and energy policies "would have to be brought in state court and decided in accordance with state contract law."[427] The national interest in balancing the need for natural resources with the environmental effects of drilling along the Gulf Coast is more akin to HUD's interest in ensuring an adequate supply of affordable housing, the Department of Defense's interest in obtaining favorable procurement contracts for military equipment, or the FRA's interest in accessible interstate public transportation than it is to the FAA's interest in enforcing the obligation of a county to not construct a garbage dump within a prescribed range of an airport. Accordingly, federal common law applies to the interpretation of the alleged contracts, and Plaintiff's breach of contract claim necessarily raises an issue of federal law.

**(b)     Actually Disputed**

The federal issues identified above—including whether Defendants' conduct constitutes an unauthorized alteration or injury to the levee systems under the Rivers and Harbors Act, whether Defendants were required to restore allegedly abandoned dredged canals under the Clean Water Act, what steps Defendants had to take to minimize environmental effects under the Coastal Zone Management Act, whether Plaintiff is a third-party beneficiary of dredging permits issued by the federal government, and whether Defendants have violated the terms of those permits—are all disputed in this case.

---

[427] *Price*, 823 F.2d at 1120.

### (c)    Substantial

The substantiality requirement demands that a federal question must not only be important to the parties, but also important to the federal system. In *Gunn v. Minton*, the Supreme Court explained that for a case to be "substantial in the relevant sense,"

> it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim "necessarily raise[s]" a disputed federal issue, as *Grable* separately requires. The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole.[428]

The Supreme Court has not fully described what makes an issue important to the federal system as a whole; however, it has provided some specific insight on the contours of substantiality. First, a federal issue may be substantial where state adjudication would "undermine the development of a uniform body of [federal] law."[429] For example, in *Gunn*, a client sued his attorney for malpractice in the handling of a patent case.[430] To prevail on his state malpractice claim, plaintiff had to establish that but-for his attorney's failure to raise a specific issue of patent law, he would have won the underlying patent case.[431] The Supreme Court acknowledged that a federal issue was necessarily raised; the trial court would have to apply patent law to determine whether plaintiff would have won the underlying case.[432] However, the Court concluded that the issue was not substantial because its resolution was unlikely to impact other cases.[433] The Court noted that

---

[428] *Gunn*, 133 S. Ct. at 1066 (emphasis in original).

[429] *Id.* at 1067 (internal citations and quotation marks omitted).

[430] *Id.* at 1063.

[431] *Id.*

[432] *Id.* at 1065.

[433] *Id.* at 1067 (noting that "[t]he present case is poles apart from *Grable*, in which a state court's resolution of the federal question would be controlling in numerous other cases").

Congress had already ensured the uniformity of patent law "by vesting exclusive jurisdiction over actual patent cases in federal district courts and exclusive appellate jurisdiction in the Federal Circuit."[434]

Additionally, a issue may be substantial where a case presents "a nearly pure issue of law . . . that could be settled once and for all," rather than a "fact-bound and situation-specific" one.[435]

Further, a federal issue may be substantial where the resolution of the issue has "broader significance . . . for the Federal Government."[436] In *Grable*, for example, the Internal Revenue Service had seized property from the plaintiff and sold it to satisfy the plaintiff's federal tax delinquency.[437] Years later, the plaintiff brought a state law quiet title action against the third party who had purchased the property, alleging that the sale was invalid because IRS had failed to comply with federal notice requirements.[438] In holding that federal-question jurisdiction existed, the Supreme Court explained that "[t]he meaning of a federal tax provision is an important issue of federal law that sensibly belongs in federal court."[439] Further, "[t]he Government has a strong interest in the prompt and certain collection of delinquent taxes, and the ability of the IRS to satisfy its claims from

---

[434] *Id.*

[435] *Empire Healthcare*, 547 U.S. at 700–01 (internal citations and quotation marks omitted); *see also Singh*, 538 F.3d at 339 ("[T]his case involves no important issue of federal law. Instead, the federal issue is predominantly one of fact.").

[436] *Gunn*, 133 S. Ct. at 1066.

[437] *Grable*, 545 U.S. at 310–11.

[438] *Id.* at 310–11.

[439] *Id.* at 315; *see also Smith*, 255 U.S. at 180 (holding that a shareholder suit seeking to enjoin a private company from investing in certain federal bonds on the grounds that the statute authorizing the issuance of those bonds was unconstitutional presented a federal question).

the property of delinquents requires clear terms of notice to allow buyers like [defendant] to satisfy themselves that the Service has touched the bases necessary for good title."[440] Accordingly, *Grable* determined that "[t]he Government thus has direct interest in the availability of a federal forum to vindicate its own administrative actions."[441]

Finally, under the Supreme Court's decision in *Merrell Dow Pharmaceuticals Inc. v. Thompson*,[442] the absence of a federal private right of action is "worth some consideration in the assessment of substantiality."[443]

Looking beyond Supreme Court jurisprudence, the Courts of Appeals have brought additional factors to bear on the substantiality analysis. For example, in *Mikulski v. Centerior Energy Corp.*, the Sixth Circuit identified four considerations relevant to whether a federal issue is substantial:

> (1) whether the case includes a federal agency, and particularly, whether that agency's compliance with the federal statute is in dispute; (2) whether the federal question is important (i.e., not trivial); (3) whether a decision on the federal question will resolve the case (i.e., the federal question is not merely incidental to the outcome); and (4) whether a decision as to the federal question will control numerous other cases (i.e., the issue is not anomalous or isolated).[444]

Conversely, in *Adventure Outdoors, Inc. v. Bloomberg*,[445] the Eleventh Circuit determined that a federal issue was not substantial

---

[440] *Id.*

[441] *Id.*

[442] 478 U.S. 804 (1986).

[443] *Grable*, 545 U.S. at 318 ("*Merrell Dow* should be read in its entirety as treating the absence of a federal private right of action as evidence relevant to, but not dispositive of, the 'sensitive judgements about congressional intent' that § 1331 requires.").

[444] *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 570 (6th Cir. 2007).

[445] 552 F.3d 1290 (11th Cir. 2008).

where (1) there was no dispute over the meaning of the federal law at issue; (2) the meaning of the federal law at issue was clear; (3) state application of the federal law did not pose a serious threat to the federal interest of uniformity and consistency of federal law; and (4) the federal legal issue was not dispositive of the case because factual issues remained no matter how the legal issue was resolved.[446]

As discussed above, the pending case necessarily raises at least the following disputed issues: whether Defendants' conduct constitutes an unauthorized alteration or injury to the levee systems under the Rivers and Harbors Act; whether the Clean Water Act required Defendants to restore allegedly abandoned dredged canals; what steps the Coastal Zone Management Act required Defendants to take to minimize environmental effects; whether Plaintiff is a third-party beneficiary of dredging permits issued by the federal government; and whether Defendants have violated the terms of those federal permits. The question now becomes whether these issues are substantial.

First, the Court recognizes the importance of the federal questions at stake in this case. The disputed issues implicate coastal land management, national energy policy, and national economic policy—all vital federal interests. Both Plaintiff and Defendants have observed the breadth of federal regulations governing the coastal lands at issue in this suit, including the Rivers and Harbors Act, the Clean Water Act, the Coastal Zone Management Act, the Natural Gas Act, the Energy Policy Act of 2005, the Coastal Wetlands Planning, Protection and Restoration Act of 1990, the Water Resources Development Act of 2007, and the Natural Gas Act.[447] Not only does the very number of applicable statutes speak to the importance of these federal issues, the actual language of the acts recognizes that these are issues of national concern. In the Coastal Zone Management Act, for example, Congress specifically found that "[t]here is a national interest in the effective

---

[446] *Davis v. GMAC Mortg. LLC*, No. 11-95, 2011 WL 860389, at *4 (M.D. Ga. Mar. 13, 2012) (internal citations omitted) (summarizing *Adventure Outdoors*).

[447] *See* Rec. Doc. 1-2 at pp. 16–17; Rec. Doc. 254 at pp. 8–13; Rec. Doc. 260 at pp. 20–22.

management, beneficial use, protection, and development of the coastal zone."[448] Similarly, under the Natural Gas Act, "it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and sale thereof in interstate and foreign commerce is necessary in the public interest."[449]

Additionally, the Court notes that although this matter is a single case, it affects an entire industry, not just a few isolated parties. Plaintiff named 149 oil and gas companies as defendants in its Petition,[450] and brought breach-of-contract claims on the basis of hundreds of permits.[451] This matter stands in stark contrast to *Gunn*, which addressed a single patent sought by one entrepreneur,[452] and *Merrell Dow*, which considered a single drug manufactured by one pharmaceutical company.[453]

While Plaintiff may not be expressly challenging a specific action of a federal agency, the breadth of Plaintiff's claims amounts to a collateral attack on an entire regulatory scheme. The Rivers and Harbors Act, the Clean Water Act, the Coastal Zone Management Act, and the Army Corps of Engineers permitting system—in conjunction with a number of other federal measures not cited by Plaintiff—are the byproducts of a federal effort to balance the country's economic need

---

[448] 16 U.S.C. § 1451(a).

[449] 15 U.S.C. § 717(a).

[450] *See* Rec. Doc. 1-2 at pp. 25–34. Ninety-two defendants remain in the litigation. Some defendants have been dismissed without prejudice. *See, e.g.*, Rec. Doc. 244. Other defendants were incorrectly named.

[451] Rec. Doc. 1-2 at pp. 104–122.

[452] *See Gunn*, 133 S. Ct. at 1062–63 (describing Vernon Minton's attempt to patent an interactive securities trading system).

[453] *See Merrell Dow*, 478 U.S. at 805–06 (describing Merrell Dow Pharmaceutical's production of Bendectin, a drug for morning sickness).

for oil and gas with local, regional, and national environmental concerns. Plaintiff's claims are premised on the notion that this regulatory framework provides inadequate protection for the residents of southeastern Louisiana, and through this litigation, Plaintiff seeks to have the entire oil and gas industry compensate residents for the shortfall. The approach taken by Plaintiff has already been replicated by other local interests, as a number of Louisiana parishes have brought similar cases against oil and gas companies for damages due to dredging activities.[454] Further, these issues are  not unique to Louisiana; state and local entities in the other Gulf states could bring similar litigation.

The Court also notes that whether state and local entities are properly considered third-party beneficiaries of federal dredging permits is "a nearly pure issue of law . . . that could be settled once and for all."[455] Additionally, if state courts interpret federal dredging permits and third-party beneficiary status inconsistently, permit holders could face different levels of liability in different jurisdictions, undermining the uniform application of federal law and further complicating

---

[454] The parish cases were initially brought in state court but have since been removed to federal court. Case No. 13-6693 *Parish of Plaquemines v. Total Petrochemical & Refining USA, Inc.*; Case No. 13-6698 *Parish of Jefferson v. Atlantic Richfield Co.*; Case No. 13-6701 *Parish of Jefferson v. Anadarko E&P Onshore*; Case No. 13-6704 *Parish of Plaquemines v. BEPCO, L.P.*; Case No. 13-6706 *Parish of Plaquemines v. Linder Oil Co.*; Case No. 13-6707 *Parish of Plaquemines v. Caskids Operating Co.*; Case No. 13-6708 *Parish of Jefferson v. Canlan Oil Co.*; Case No. 13-6709 *Parish of Plaquemines v. Palm Energy Offshore, LLC*; Case No. 13-6710 *Parish of Plaquemines v. Riverwood Prod. Co.*; Case No. 13-6711 *Parish of Plaquemines v. Apache Oil Corp.*; Case No. 13-6712 *Parish of Plaquemines v. June Energy, Inc.*; Case No. 13-6714 *Parish of Jefferson v. Equitable Petroleum Corp.*; Case No. 13-6715 *Parish of Plaquemines v. Helis Oil & Gas Co.*; Case No. 13-6716 *Parish of Plaquemines v. Devon Energy Prod. Co.*; Case No. 13-6717 *Parish of Jefferson v. Exxon Mobil Corp.*; Case No. 13-6718 *Parish of Plaquemines v. Campbell Energy Corp.*; Case No. 13-6719 *Parish of Plaquemines v. LLOG Exploration & Prod. Co.*; Case No. 13-6720 *Parish of Plaquemines v. Conoco Phillips Co.*; Case No. 13-6722 *Parish of Plaquemines v. Rozel Operating Co.*; Case No. 13-6723 *Parish of Plaquemines v. Goodrich Petroleum Co.*; Case No. 13-6727 *Parish of Plaquemines v. Hillcorp Energy Co.*; Case No. 13-6728 *Parish of Jefferson v. Destin Operating Co.*; Case No. 13-6729 *Parish of Plaquemines v. Northcoast Oil Co.*; Case No. 13-6732 *Parish of Plaquemines v. Exchange Oil & Gas Corp.*; Case No. 13-6733 *Parish of Plaquemines v. Great Southern Oil & Gas Co.*; Case No. 13-6735 *Parish of Plaquemines v. HHE Energy Co.*; Case No. 13-6736 *Parish of Plaquemines v. Equitable Petroleum Corp.*; Case No. 13-6738 *Parish of Jefferson v. Chevron U.S.A. Holdings, Inc.*

[455] *Empire Healthcare*, 547 U.S. at 700–01 (internal citations and quotation marks omitted).

a permitting process that seeks to balance difficult environmental and economic considerations. These factors suggest that the issue is substantial.

Given the replication of these critical federal issues of law in the parish suits and the potential for even more litigation, the Court finds that Plaintiff's action "justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."[456] Although in applying *Merrell Dow* the absence of a federal right of action is certainly some evidence against substantiality, *Grable* held that the absence of a federal right of action is not dispositive.[457] In this case, the other considerations described above prevail. Accordingly, the Court finds that the federal issues at stake are substantial.

### (d)    Federal-State Balance

In determining whether finding jurisdiction would disturb the balance of federal and state judicial responsibilities, the Court must consider whether exercising jurisdiction would "herald an enormous shift of traditionally state cases into federal courts."[458] Plaintiff's claims in this matter are not typical state law negligence and contract claims. Rather, Plaintiff's claims look to federal law to impose liability on an entire industry for the harms associated with coastal erosion. The backfilling, revegetation, and restoration actions that Plaintiff seeks in its request for injunctive relief will impact coastal land management of Louisiana and neighboring states as well as national oil and gas markets. Further, federal courts are particularly familiar with the federal regulatory scheme that forms the foundation of Plaintiff's claims and with the law to be applied to contracts

---

[456] *Grable*, 545 U.S. at 314.

[457] *Id.* at 318 ("*Merrell Dow* should be read in its entirety as treating the absence of a federal private right of action as evidence relevant to, but not dispositive of, the 'sensitive judgments about congressional intent' that § 1331 requires.").

[458] *Id.* at 319.

to which the United States is a party. Accordingly, the Court finds that exercising jurisdiction will not disturb the balance of federal and state judicial responsibilities.

Considering that Plaintiff's state law claims necessarily raise a federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing the congressionally approved balance of federal and state judicial responsibilities, the Court finds that federal question jurisdiction exists.

### VIII. Conclusion

As discussed above, the Court does not find grounds to exercise admiralty jurisdiction or federal enclave jurisdiction in this matter. Further, neither OCSLA's nor CAFA's jurisdictional grant applies here. However, the Court does find that it has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff's state law claims necessarily raise a federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing the congressionally approved balance of federal and state judicial responsibilities. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's "Motion to Remand"[459] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this __27th__ day of June, 2014.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[459] Rec. Doc. 70.